## OLSON *v.* UNITED STATES.*

No. 580.   Argued March 9, 1934.—Decided April 30, 1934.

* Together with No. 581, *Karlson* v. *United States;* and No. 582, *Brewster* v. *United States.*

*Mr. I. K. Lewis,* with whom *Messrs. C. E. Berkman* and *John H. Hougen* were on the brief, for petitioners.

*Mr. Harry H. Peterson,* Attorney General of Minnesota, and *Mr. David J. Erickson,* Assistant Attorney General, joined in petitioners' brief on behalf of the State of Minnesota.

*Mr. Charles Bunn,* with whom *Solicitor General Biggs* and *Assistant Attorney General Blair* were on the brief, for the United States.

*Mr. George Wharton Pepper,* with whom *Mr. John E. Read* was on the brief, for the Government of Canada.

MR. JUSTICE BUTLER delivered the opinion of the Court.

These cases arise in a condemnation proceeding instituted by the United States in the federal district court for Minnesota to acquire easements of flowage upon lands bordering upon the Lake of the Woods in that State. The only substantial question is whether, on the facts disclosed by the record and others of which judicial notice may be taken, the actual use and special adaptability of petitioners' shorelands for the flowage and storage of water, that *inter alia* will be available for the generation of power, may be taken into consideration in ascertaining the just compensation to which petitioners are entitled.

The superficial area of the Lake of the Woods is between fourteen and fifteen hundred square miles; it lies in Minnesota, Ontario and Manitoba. Many streams flow into it. The Rainy River and Warroad River are the largest of those touching Minnesota. The former, coming from the east along the international boundary, drains a very large territory lying on both sides of the line. The latter, not so large, coming from the south, drains a considerable area within Minnesota and empties into the southwesterly part of the lake. The outlets of the lake are in Canada; they combine to make the Winnipeg, a great river, flowing northwesterly to Lake Winnipeg. In 1898 a Canadian corporation, by agreement with the

Crown, put in operation the Norman dam for the control of outflow down the Winnipeg. Since the construction of this dam and in consequence of it and other dams in the outlets, shorelands, in disregard of the rights of owners, have been intermittently flooded for the impounding of water used in Canada for the generation of power and other purposes.

In 1909 the United States and Great Britain made a treaty which (Art. VIII) created an international joint commission and conferred upon it jurisdiction in terms broad enough to include cases involving the elevation of the Lake of the Woods as the result of these dams. 36 Stat. 2451. In 1912 questions arising out of the raising of the lake were referred to the commission; and after hearings and extensive studies it made its final report in 1917. The United States and Great Britain then consummated the treaty of 1925, which provides (Article VIII): "A flowage easement shall be permitted up to elevation 1064 sea level datum upon all lands bordering on Lake of the Woods in the United States, and the United States assumes all liability to the owners of such lands for the costs of such easement." [1]

---

[1] Article IX provides: " The United States and the Dominion of Canada shall each on its own side of the boundary assume responsibility for any damage or injury which may have heretofore resulted to it or to its inhabitants from the fluctuations of the level of Lake of the Woods or of the outflow therefrom.

" Each shall likewise assume responsibility for any damage or injury which may hereafter result to it or to its inhabitants from the regulation of the level of Lake of the Woods in the manner provided for in the present Convention."

Article X contains the following: " In consideration, however, of the undertakings of the United States as set forth in Article VIII, the Government of Canada shall pay to the Government of the United States the sum of two hundred and seventy-five thousand dollars ($275,000) in currency of the United States. Should this sum prove insufficient to cover the cost of such undertakings one-half of the excess of such cost over the said sum shall, if the expenditure be in-

By an Act to carry into effect the provisions of the last mentioned treaty (Act of May 22, 1926, 44 Stat. 617, as amended April 18, 1928, 45 Stat. 431) Congress directed the Secretary of War to acquire by purchase or condemnation flowage easements up to the specified elevation upon all lands in Minnesota bordering upon the Lake of the Woods, the Warroad River and the Rainy River, and that compensation should be made in accordance with the Constitution of Minnesota, which declares (Article I, § 13): " Private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured." Commissioners appointed to ascertain the damages sustained by the several owners by reason of such taking made their awards. The United States and these petitioners appealed. The cases were tried together, the jury returned verdicts for the amounts to which petitioners were found severally entitled, and judgments were entered accordingly.[2] Petitioners ap-

---

curred within five years of the coming into force of the present Convention, be paid by the Government of Canada."

Treaty of February 24, 1925, 44 Stat. 2108.

[2] Petitioner Olson, as stated in the condemnation petition, owns, as part of a homestead, 55.21 acres below contour 1064. He claimed $300 per acre, making in all $16,563. The commissioners awarded $1,296.50, including $40 for damage to dock and wharf. The jury's verdict was $490.

Petitioner Karlson, as stated in the condemnation petition, owns 163.65 acres below contour 1064. It lies in two parcels, one of which, 120 acres, he bought in 1921 for $175, or about $1.45 per acre. He claimed $275 per acre, or a total of about $44,000. The commissioners made but one award, $3,660. The jury's verdict was $880.

Petitioner Brewster, as stated in the condemnation petition, owns as part of his homestead 98.55 acres (exhibits indicate this should be about 156 acres) below contour 1064. Though contiguous, it is listed as three parcels. He claimed $300 per acre, making in all $46,965. The commissioners awarded $640.70 for one parcel of 32.15 acres and $3,195.80 for the remainder, about 124 acres, making in all $3,836.50. The jury's verdict for all three was $900.

pealed. The Circuit Court of Appeals affirmed. 67 F. (2d) 24.

At the trial petitioners sought to have just compensation ascertained on the theory that the flooding of their lands (for brevity called " use for reservoir purposes "), the circumstances which make them specially adaptable for that use, and the fact that prior to condemnation such adaptability had increased their market value, should be considered by the jury in determining just compensation. And, in order to establish a basis on which to rest that submission, petitioners offered to prove the following facts:

There are valuable power sites at the outlets and in the Winnipeg river which cannot be fully developed without flooding the shorelands. The industries using these waters to produce power are well established and financially responsible. Demand for electricity there produced will increase. The raising of the lake level creates a storage reservoir, of which petitioners' lands form a part, that serves to increase potential capacity by about 200,-000 continuous horse power, which is worth more than one million dollars annually. Competition exists for the right to develop and control that capacity, the value of which is so great that one or another of the competitors would have acquired the flowage rights if the United States had not done so. It is entirely practicable for private enterprises to acquire flowage easements. Publicity, long given to the great value of the lake as a storage reservoir, created a demand and affected the market value of shorelands needed for that purpose. And, in connection with the facts above stated, petitioners offered to prove the fair market values of their lands before and after the imposition of the flowage easement, taking into consideration all the facts and circumstances affecting market prices.

Respondent, having obtained leave to establish foundation for objection to petitioners' offers to prove, introduced evidence of the following facts:

The main shore line of the Lake of the Woods, including the affected reaches of the Rainy river, exceeds 1035 miles, of which more than 110 are in Minnesota. There are in the lake a number of islands of a mile or over in length and approximately 10,000 smaller ones. The shorelines of the islands exceed 1180 miles, of which about 20 miles are in Minnesota. Below sea-level datum 1064, established by the treaty, there are about 850 parcels owned by more than 775 individuals. If mortgagees and other claimants are counted, the number to be dealt with is not less than 1225 persons. Of these, only 496 live on or near the land, 186 live elsewhere in Minnesota, and 123 in other parts of the United States and Canada. The addresses of 401 are unknown. The United States owns a considerable part—about one-fifth—of the shore line in Minnesota. Small areas are held under homestead entries. The State of Minnesota owns a small piece subject to contracts of sale.

And it was made to appear:

None of the 35 miles of shore lands in Manitoba, of which about 14,427 acres lie below contour 1064, are privately owned. In 1915 they were reserved by the Dominion in anticipation of action by the International Joint Commission to regulate lake levels, and in 1930 they were transferred to the Province. In Ontario more than 700 persons own shorelands. In 1920 that Province, in accordance with the recommendations of the Commission, withdrew its lands below the established level—about 13,043 acres—from private entry. On the Canadian side about 40 Indian reservations include 8,600 acres below the established level along about 250 miles of shore line. These lands may be disposed of only with the assent of a majority of the male members of the band of the full age

of 21 years, at a meeting summoned for that purpose according to the rules of the band, and subject to the approval of governmental authority.

The Lake of the Woods is one of the water communications which by the Webster-Ashburton Treaty is required to be free and open to the use of the citizens and subjects of both countries. Its usefulness for navigation is a matter of great concern. The United States is interested in navigation and in the protection of owners of shore lands on the American side rather than in the development of power in Canada. The levels controlled by dams in the outlets were regulated by Canadian authority until the creation of an international regime in pursuance of the Treaty of 1925. Regulation has not been exclusively for the production of power but, so far as practicable, for the protection of all interests, including navigation, logging, domestic use of water, irrigation and power.

The trial judge, being of opinion that under the circumstances neither the use nor the special adaptability of petitioners' lands for reservoir purposes could be considered in determining their market value, excluded the evidence offered by the petitioners. He instructed the jury first to determine as to each piece of land its fair market value on May 4, 1929—before the easement was imposed—taking into consideration the fact that prior to the taking the Government had the right to maintain the level of the lake up to 1059 sea-level datum (that may be taken as the natural level); next to find the fair market value after the taking, and that the difference is the amount for which the Government is liable. To guide the jury in the ascertainment of such values, the court charged: " You will take into consideration all of the uses for which the property was available on May 4, 1929, and May 5th, 1929, and determine what use it was most valuable for, and base your award thereon; but you will not

make an award based on any claim for reservoir value. I have held that under the law the value of these lands could not be based upon the use of the lake and its shores for reservoir purposes. It is, as I understand it, conceded that the only other use for which these lands are suited, with the exception perhaps of Mr. Olson's tract, is for agricultural purposes, or purposes relating to agriculture, so that it is for those purposes that you are to value these lands." The court suggested that petitioner Olson's lands might be used for fishing purposes and instructed the jury, if it so found, to " add to the value which it might have for agricultural purposes, any added value which might accrue to it, because of its usefulness as a fishing station." Under these instructions the Government was not entitled to, and it has not claimed, lesser awards because of diminution of value caused by the unauthorized flooding of petitioners' lands. The owners were severally entitled to the compensation then due as if no such trespass had been committed.

The rule prescribed by the Minnesota constitution is not, at least so far as concerns these cases, to be distinguished from that expressed by the just compensation clause of the Fifth Amendment and implied in the due process clause of the Fourteenth Amendment to the Federal Constitution. The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in *Monongahela Navigation Co.* v. *United States*, 148 U.S. 312, 324: " In any society the fulness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government." The statement in that opinion (p. 326) that " no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned

to the owner " aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U.S. 362, 399.

That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. *Seaboard Air Line Ry.* v. *United States,* 261 U.S. 299, 306. *Jacobs* v. *United States,* 290 U.S. 13, 17. 2 Lewis, Eminent Domain, 3d ed., § 682, p. 1172. It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain. *Vogelstein & Co.* v. *United States,* 262 U.S. 337, 340. He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and federal constitutions. *Minnesota Rate Cases,* 230 U.S. 352, 454.

Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. *Boom Co.* v. *Patterson,* 98 U.S. 403, 408. *Clark's Ferry Bridge Co.* v.

*Public Service Comm'n,* 291 U.S. 227. 2 Lewis, Eminent Domain, 3d ed., § 707, p. 1233. 1 Nichols, Eminent Domain, 2d ed., § 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. *New York* v. *Sage,* 239 U.S. 57, 61. It is common knowledge that public service corporations and others having that power frequently are actual or potential competitors, not only for tracts held in single ownership but also for rights of way, locations, sites and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. *Boom Co.* v. *Patterson, ubi supra.* But the value to be ascertained does not include, and the owner is not entitled to compensation for any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to the compensation to which the owner is entitled. *New York* v. *Sage, ubi supra. United States* v. *Chandler-Dunbar Co.,* 229 U.S. 53, 76, 80. *Shoemaker* v. *United States,* 147 U.S. 282, 305. *Kerr* v. *South Park Commissioners,* 117 U.S. 379, 386. *Union Electric Light & Power Co.* v. *Snyder Estate Co.,* 65 F. (2d) 297, 304. The use of shore lands for reservoir purposes prior to the taking shows merely the physical possibility of so controlling the level of the lake. But physical adaptability alone cannot be deemed to affect market value. There must be a reasonable possibility that the owner could

use his tract together with the other shore lands for reservoir purposes or that another could acquire all lands or easements necessary for that use. The trespass committed by means of the dams added nothing to the value of the shore lands.

Flowage easements upon these lands were not currently bought or sold to such an extent as to establish prevailing prices, at or as of the time of the expropriation. As that measure (*United States* v. *New River Collieries,* 262 U.S. 341, 344) is lacking, the market value must be estimated. In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. *Brooks-Scanlon Corp.* v. *United States,* 265 U.S. 106, 124. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. Cf. *Minnesota Rate Cases, supra,* p. 452. *Smith* v. *Illinois Bell Tel. Co.* 282 U.S. 133, 152. *Los Angeles Gas Co.* v. *Railroad Comm'n,* 289 U.S. 287, 319.

Petitioners rely on *Boom Co.* v. *Patterson,* 98 U.S. 403. At the time of that condemnation, logs belonging to many

owners were floated down the Mississippi to sawmills at and below the Falls of St. Anthony. Patterson owned three islands, about 34 acres, in the river a few miles above the falls, lying near to each other and approximately parallel to the west bank. The company, merely by closing the spaces between the islands and connecting the downstream end to the bank so as to prevent the passage of floating logs, created a boom about a mile long and a quarter of a mile wide. The owner objected to that use of his property and the company condemned. There was evidence of value other than for boom purposes and also of value for all purposes. The jury specially found that aside from boom purposes the value of the land was $300 and that, in view of the adaptability for boom purposes, it had an additional value of $9,058.33. There was a general verdict for the sum of these amounts. The court ordered the verdict set aside unless the owner consent to reduce it to $5,500. He did consent and judgment was entered for that amount.

Upon appeal this court affirmed and, speaking through Mr. Justice Field, said (pp. 407–409): " In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted. . . . The position of the three islands . . . fitting them to form, in connection with the west bank . . . a boom of immense dimensions . . . added largely to the value of the lands. . . . Their adaptability for boom purposes was a circumstance, therefore, which the owner had a right to insist upon as an element in estimating the value of his lands. We do not understand that all persons, except the plaintiff in error,

were precluded from availing themselves of these lands for the construction of a boom, either on their own account or for general use. . . . The Mississippi is a navigable river above the Falls of St. Anthony, and the State could not confer an exclusive use of its waters, or exclusive control and management of logs floating on it, against the consent of their owners."

The principle governing that case has been frequently applied here[3] and in the lower federal courts.[4] The decision is authoritative in state courts in all condemnation cases in which the owner invokes protection of the due process clause of the Fourteenth Amendment.[5] But clearly it does not support petitioners' contention here.

[3] *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U.S. 226, 250. *Boston Chamber of Commerce* v. *Boston,* 217 U.S. 189, 195. *United States* v. *Chandler-Dunbar Co.,* 229 U.S. 53, 77. *McGovern* v. *New York,* 229 U.S. 363, 372. *Minnesota Rate Cases,* 230 U.S. 352, 451. *Vogelstein & Co.* v. *United States,* 262 U.S. 337, 340. *United States* v. *New River Collieries,* 262 U.S. 341, 344. *Mitchell* v. *United States,* 267 U.S. 341, 345.

[4] *Murhard Estate Co.* v. *Portland & Seattle Ry. Co.,* 163 Fed. 194, 199. *Weiser Valley Land & Water Co.* v. *Ryan,* 190 Fed. 417, 421–422. *Denver & R. G. R. Co.* v. *Mills,* 222 Fed. 481, 489. *Northern Pac. Ry. Co.* v. *North American Tel. Co.,* 230 Fed. 347, 356. *North American Telegraph Co.* v. *Northern Pac. Ry. Co.,* 254 Fed. 417, 419. *United States* v. *Boston, C. C. & N. Y. Canal Co.,* 271 Fed. 877, 893. *Ford Hydro-Electric Co.* v. *Neely,* 13 F. (2d) 361, 362. *Guste* v. *United States,* 55 F. (2d) 115, 116.

[5] Illustrative cases are: *Fales* v. *Easthampton,* 162 Mass. 422, 425; 38 N.E. 1129. *Smith* v. *Commonwealth,* 210 Mass. 259, 261; 96 N.E. 666. *North Shore R. Co.* v. *Penna. Co.,* 251 Pa. 445, 450; 96 Atl. 990. *Rock Island & Peoria Ry. Co.* v. *Leisy Brewing Co.,* 174 Ill. 547, 555; 51 N.E. 572. *Currie* v. *Waverly & N. Y. B. R. Co.,* 52 N.J.L. 381, 396; 20 Atl. 56. *Russell* v. *St. Paul, Minneapolis & Manitoba Ry. Co.,* 33 Minn. 210, 214; 22 N.W. 379. *Conan* v. *Ely,* 91 Minn. 127, 131; 97 N.W. 737. *Santa Ana* v. *Harlin,* 99 Cal. 538, 542; 34 Pac. 224. *Alloway* v. *Nashville,* 88 Tenn. 510, 519; 13 S.W. 123.

The circumstances there disclosed required submission to the jury of the question whether the use and special adaptation of the islands for boom purposes affected market value at the time of the taking. They were amply sufficient to warrant a finding that the islands were well suited and presently needed for that purpose and that demand for them, actual or prospective, to form a part of a boom greatly enhanced their market value. The boom company could not exclude others from handling logs floated in the river. The owner and others had the right to use the island lands to construct a boom for their own purposes or for general use.

The situation in respect of lands bordering the Lake of the Woods is essentially different. The fact that the raising of the lake would take or damage shore lands could not affect their market value. There could be no rational basis for any demand that would affect value to the owner for reservoir purposes unless, as a legal and practical possibility, he or some other person or persons—other than the expropriating authority—could have acquired the right to flow the lands necessary for the lawful raising of the lake. The lands upon which the flowage easement is condemned are located in two countries. Neither could authorize expropriation in the other. Petitioners did not cite or offer evidence of any instance of acquisitions, without reliance upon the power of eminent domain, that are at all comparable with those under consideration. When regard is had to the number of parcels, private owners, Indian tribes and sovereign proprietors to be dealt with, it is clear that there is no foundation for opinion evidence to the effect that it was practicable for private parties to acquire the flowage easements in question.

The policy of joint governmental control of the lake levels was indicated years before the taking. The lands in Manitoba and Ontario that long prior to the condemna-

tion were reserved in anticipation of measures to be taken for the raising of the lake level were essential to the enterprise. Additional reservoir capacity could not lawfully be created without them, and they could not be purchased or condemned. There was no justifiable basis for competition for the purchase of flowage rights from private owners. Rivalry between power companies or others to secure opportunity to develop capacity resulting incidentally from lake levels established in the settlement of, or to prevent, controversy between the parties to the treaty or between either of them and nationals of the other is too remote to warrant a finding that market value of petitioners' lands was thereby enhanced. It had no direct, and could have no substantial or legitimate, influence upon such value.

As just compensation includes no increment resulting from the taking, petitioners were not entitled to elements of value arising from the prospect that the Government would acquire the flowage easements. Under the circumstances, intention to acquire was the equivalent of the formal designation of the property to be taken. Prices actually paid, and estimates or opinions based, upon the assumption that value to owners includes any such elements are not entitled to weight and should not be taken into account. On the facts shown, it conclusively appears that there was no element of value belonging to petitioners that legitimately could be attributed to use and adaptability of their lands for reservoir purposes. The evidence covered by petitioners' offers was inadmissible. The court rightly excluded reservoir uses from consideration.

In their brief, petitioners complain that the trial court instructed the jury " to consider only the value of the lands for agriculture, although it was admitted that the lands were not suitable for agriculture and had never been used for that purpose." The parts of the charge

above quoted show that the statement is without foundation as to Olson's land and inaccurate as to all. The record definitely shows that petitioners did not claim that, except for reservoir purposes, their lands are worth more than their value for agriculture. Moreover, the point is not made in the specification of errors or in the reasons given in the petition for this writ. The contention is not properly before us. *Gunning* v. *Cooley*, 281 U.S. 90, 98.

Petitioners maintain that the Circuit Court of Appeals erred in holding that the Treaty of 1909 did not give redress, and that they had no remedy, for the wrongful flooding of their lands. The statements in the opinion assailed by specifications of error in petitioners' brief were made *arguendo* and do not constitute decision of any point on which petitioners there sought reversal. The questions considered below concerned compensation for flowage easements. The condemnation was under § 1 of the Act of May 22, 1926, *supra.* The property taken was the right to use in the future. The commissioners were not authorized to make any award on account of damages caused by unlawful flooding of shore lands prior to the taking. That is clear from § 1, and especially so when its provisions are read in connection with the general condemnation Act of August 1, 1888, 25 Stat. 357, and the rule of just compensation prescribed by the Constitution of Minnesota, both of which are expressly adopted by that section. Moreover, § 3 directs the Secretary of War to deal with all claims for damages caused, prior to the acquisition of flowage easements under this Act, to the inhabitants of the United States by fluctuation of the water levels of the Lake of the Woods due to artificial obstructions in the outlets. No question of liability for, or the amount of, such damages was before the lower courts.

*Judgments affirmed.*