## UNITED STATES v. PENNSYLVANIA-DIXIE CEMENT CORPORATION.
### No. 10836.

United States Court of Appeals
Sixth Circuit.
Dec. 8, 1949.

Harold S. Harrison, Washington, D. C. (A Devitt Vanech, John F. Cotter, Harold S. Harrison, Washington D. C., Otto T. Ault, Chattanooga, Tenn., on the brief), for appellant.

Charles C. Moore, Chattanooga, Tenn. (Charles C. Moore, Chattanooga, Tenn., on the brief), for appellee.

Before HICKS, Chief Judge, and SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On an unusual factual situation, the issue here is whether the district court adopted a lawfully justifiable method of measuring just compensation for the taking by eminent domain of the interest of the appellee corporation in a tract of land in Sullivan County, Tennessee. On June 24, 1940, the appellee entered into a contract in writing with Brick Realty Corporation, owner in fee of the land subsequently condemned by the United States, by virtue of which appellee was granted the exclusive right for a period of ten years to enter upon a described three acres of the land and to remove therefrom sand in such quantities as it might desire.

For nearly thirty years before this contract was made, the appellee had been a manufacturer of Portland cement at Kingsport, Tennessee. The Brick Realty Corporation was a manufacturer of brick. The two companies owned adjoining properties along the Holston River upon which were large deposits of sand, partly on the property of one and partly on the property of the other. The sand bank was about a half mile from the plant of appellee; and, while there were quantities of sand in the general neighborhood, such deposits were so remotely located that the cost of hauling by truck for more than a short distance was prohibitive.

When the government took possession of the land in the latter part of 1942, appellee had already removed from the sand deposit in controversy 12,724 tons for use in the manufacture of cement. Admittedly, 12,313 tons then remained.

With its local supply of sand cut off, appellee began to purchase its requirements from suppliers in Forest City, North Carolina, and Erwin, Tennessee, at a price of $1.50 a ton, f. o. b. its plant. This was the lowest price obtainable.

In its first memorandum opinion, the court declared that, in determining value in cases "where comparable sales or sales of comparable quantities similarly situated cannot be found to establish market value," it must "adopt other methods of arriving at a value such as the cost of duplication of the thing taken and comparisons of such costs with the actual cost of appropriating to use the thing lost at the place where the taking occurred." Considering the element of uncertainty in the "conclusions of some of the witnesses", the court adjudged the value of the sand in place at the time taken to be $7,000.

The appellee moved for an amendment of the judgment to an increased value, or in the alternative for a new trial. The court received additional testimony limited to the question of the cost of delivering sand from the deposit on the condemned

land to the cement plant of the appellee. In its opinion, filed following consideration of the additional testimony, the court said: "The sand deposit covered about three acres and was included within the boundaries of the condemned tract. The record shows that the government entered upon the condemned land about October 1, 1942, although its petition and declaration of taking were not filed until November 20, 1944. At the time the cement company was excluded from further operations on the land, there remained in the deposit 12,313 tons of recoverable and usable sand. Prior to the taking, the cement company had been removing sand from the deposit and hauling it to its Kingsport cement plant, a distance of approximately one mile, most of the way over a public road. After the taking, it was necessary for the cement company to buy sand in replacement of that which was lost by the taking. This replacement sand cost the cement company $1.50 per ton, delivered at its plant. As it owned the sand on the condemned land, it could have used that sand, saving the difference between the cost of delivering it and the cost of buying its equivalent. An undetermined figure represented the cost of making the cement company's own sand available at its plant. That cost, subtracted from the replacement cost, represents the damage to the cement company caused by the taking of the condemned tract." The court said that considering the elements of cost, including operating labor, repair labor, operating supplies, repair materials, deferred operating costs chargeable to labor and materials, and items of overhead expense, the proof showed that the cost to the cement company for making its own sand available at its plant averaged 34.85 cents per ton. When this figure is subtracted from the replacement cost of $1.50 and the difference multiplied by the 12,313 tons of condemned sand, the result is found to be $14,178.42, for which amount judgment was awarded to appellee.

The Brick Realty Corporation, as owner of the fee interest in the entire tract of 12.75 acres, more or less, was awarded $4,995 as just compensation for its interest in the condemned land. The United States has appealed from the final judgment of the district court, and insists that the market value of the interest of appellee in the sand on the particular tract in controversy constituted just compensation therefor. The appellee's rejoinder is that, where condemned property has no general market value as it insists is true in the instant case, the actual value to the owner is the only measure of just compensation; and that the trial court adopted a correct basis of evaluation.

Undoubtedly, the particular sand bank in controversy was of especial value to appellee on account of its propinquity to its plant. But the government contends that peculiar value which property has to a particular owner is not the true standard of evaluation in condemnation cases; that market value, assuming fair negotiations between an owner willing to sell and a purchaser desiring to buy, is the true criterion in determining just compensation.

There was some testimony adduced by the government that the cash market value of the sand, assuming a willing buyer and a willing seller, would be $4,160. To the contrary, the appellee introduced evidence that there was no general market in the vicinity for sand banks like the one in controversy.

Viewing the evidence in entirety, it appears to us that the case was not tried on either side, or by the district judge, in such manner as to present a satisfactory record as to market value. Only one witness for the government, a civil engineer, expressed an opinion as to market value. Another witness, a land appraiser, based his opinion upon that of the first witness who had testified: "I made calls on different sand people and different property owners. * * * I got the price of sand from people below the plant, and on up above the river. I also got prices from sand dealers of what they were paying for sand, and not one of these people I called on but what had been offered money for sand located on his property. One I recall in particular was a man named Berry,

and that is about the same sand you will find down below there, he said he had that sand on his place, and would sell it for thirty cents a yard. * * * You can buy that sand up and down the river any place for thirty to forty cents." For appellee, two witnesses testified that no similar sand banks in the neighborhood had been sold; and another witness, a division superintendent of appellee, testified that there "is so little demand for sand for making raw mixture for a cement plant it is difficult to say what the market value might be. There is not sufficient demand for sand of this quality; no other cement plant uses it but ours, and it is hard to state the market value of this poor grade of sand."

■ From our study of the record, this is not a case in which it could properly be said that there is no market value for the property condemned by the government; and the Supreme Court has made it clear that market value of property taken for public use is the standard for determination of just compensation, unless it be shown that the property has no market value.

■■ In United States v. Petty Motor Co., 327 U.S. 372, 377, 378, 66 S.Ct. 596, 599, 90 L.Ed. 729, Mr. Justice Reed said: "The Constitution and the statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory. Since 'market value' does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings." Among other cases, the Supreme Court cited United States ex . rel. and for use of TVA v. Powelson, 319 U.S. 266, 285, 63 S.Ct. 1047,

1057, 87 L.Ed. 1390, wherein it was said that the "Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment." Mitchell v. United States, 267 U.S. 341, 344, 345, 45 S.Ct. 293, 294, 69 L.Ed. 644, was also cited in the Petty Motor Company case. There, the court said, through Mr. Justice Brandeis, that "the special value of land due to its adaptability for use in a particular business is an element which the owner of land is entitled, under the Fifth Amendment, to have considered in determining the amount to be paid as the just compensation upon a taking by eminent domain"; but added that settled rules of law, however, preclude a consideration of consequential damages for losses to the business of the land owner, or for its destruction.

United States v. General Motors Corporation, 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311, 156 A.L.R. 390, involved the issue of what was just compensation for the taking by eminent domain of part of the remainder of the term of a tenant's long-term leasehold on a portion of a building. Mr. Justice Roberts said: "In the ordinary case, for want of a better standard, market value, so-called, is the criterion of that value. In some cases this criterion cannot be used either because the interest condemned has no market value or because, in the circumstances, market value furnishes an inappropriate measure of actual value." The court held that the leaseholder was entitled to compensation for the destruction, damage, or depreciation in value of fixtures and permanent equipment, not as a part of but in addition to the value of occupancy.

The same Justice said, in United States v. Miller, 317 U.S. 369, 373, 374, 375, 63 S.Ct. 276, 279, 87 L.Ed. 336, 147 A.L.R. 55: "The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property

had not been taken. It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value', the 'market value', and the 'fair market value' of what is taken. The term 'fair' hardly adds anything to the phrase 'market value', which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given', [City of New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L. Ed. 143], or, more concisely, 'market value fairly determined' [Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236]. Respondents correctly say that value is to be ascertained as of the date of taking. But they insist that no element which goes to make up value as at that moment is to be discarded or eliminated. We think the proposition is too broadly stated. Where, for any reason, property has no market, resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons. Again, strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case, as where the formula is attempted to be applied as between an owner who may not want to part with his land because of its special adaptability to his own use, and a taker who needs the land because of its peculiar fitness for the taker's purposes. These elements must be disregarded by the fact-finding body in arriving at 'fair' market value."

Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236, recognized that the market value of the condemned property at the time of the taking is the criterion for the determination of just compensation. In Phelps v. United States, 274 U.S. 341, 344, 47 S.Ct. 611, 71 L.Ed. 1083, it was asserted that the government's object is to put the owner in as good position pecuniarily as if the use of his property had not been taken. Compare Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934; Seaboard Airline Railway v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664. Joslin Mfg. Company v. City of Providence, 262 U.S. 668, 43 S. Ct. 684, 67 L.Ed. 1167, held that injury to a business carried on upon lands taken for public use does not constitute an element of just compensation in the absence of a statute allowing it.

It seems firmly established that where private property is taken for public use, and there is a market price prevailing at the time and place of taking, that price is just compensation. United States v. New River Collieries Company, 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014. See also United States v. Chandler, Dunbar Water Power Company, 229 U.S. 53, 80, 81, 33 S.Ct. 667, 57 L.Ed. 1063; Boom Co. v. Patterson, 98 U.S. 403, 407, 25 L. Ed. 206.

It was held in Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 30 S.Ct. 459, 460, 54 L.Ed. 725, that where one person owns land condemned subject to servitudes to others, the parties in interest are not entitled to have damages estimated as if the land were the sole property of one owner; nor are they deprived of their property without due process of law within the meaning of the Fourteenth Amendment because each is awarded the value of his respective interest in the property. Mr. Justice Holmes said that the Constitution "deals with persons, not with tracts of land."

In Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644, it was declared in an opinion by Mr. Justice Brandeis to be a settled rule that damages resulting from a loss or destruction of a business incidental to the taking of land by eminent domain are not recoverable as part of the compensation for the land taken. We do not find significant here, in view of later expressions of the Supreme Court, the dicta of Mr. Justice Brewer in his long opinion in Monongahela Navigation Company v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, decided in 1893. That case involved consideration of a franchise, while the instant case does not concern a franchise, but rather the right of the leaseholder of the sand bank to take sand therefrom.

The foregoing discussion of what are considered relevant expressions and decisions of the Supreme Court is more extended than we should desire. But no one of the cases has seemed to us to be directly in point upon the instant controversy, and so we have felt constrained to review the cases which, considered in entirety, impel our conclusion that the judgment rendered in the district court is not grounded upon a sufficient recognition of the rule that the determination of market value, where the property taken has a market value, must be applied in the adjudication of just compensation for land taken by the United States by right of eminent domain.

In our judgment, the case must be remanded for a new trial, at which the contending parties should adduce more elucidating evidence as guidance toward the ascertainment of market value. Appellee should be permitted to introduce again the same character of proof with respect to the cost of its requirements of sand of the quality of which it was deprived by the condemnation of the sand bank from which it had the right to take sand over the period fixed in the contract. This would be an important element to be considered in determining market value; but it is not the sole consideration, as it was made by the district court, for the ascertainment of just compensation.

Were this an action for breach of contract for failure to deliver sand, the measure of damages adopted by the court could well be appropriate and applicable; but this is a condemnation suit and not a breach of contract action. The right to take the sand extended over a period of years: the value of the deposit might be affected by prospects of future increase or decrease in the cost of similar sand. The award of the district court was, we think, erroneously based upon the fixed value of the cost of replacement of the sand at the time the property was taken.

The special quality of the sand should, of course, be considered in estimating its market value. Also, the increased market value of the sand because of its proximity to the plant of the appellee is an element properly to be considered. But, while all such factors may be considered, the final inquiry, according to the authorities as we construe them, must be the fair market value of the sand, assuming a purchaser willing and able to buy and a seller willing to sell.

Accordingly, the judgment of the district court is reversed and the cause is remanded for a new trial.