535 F.Supp. 287 (1982)
Leo A. DREY and Kay K. Drey, Plaintiffs,
v.
The UNITED STATES of America, Defendant.
No. 81-521C(2).
United States District Court, E. D. Missouri, E. D.
March 31, 1982.
Hugh R. Law, Charles A. Lowenhaupt, Lowenhaupt, Chasnoff, Freeman, Armstrong & Mellitz, St. Louis, Mo., for plaintiffs.
Ludwig H. Adams, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs Leo A. Drey and Kay K. Drey brought this cause of action pursuant to 28 U.S.C. § 1346(a)(1). Plaintiffs instituted this suit against the United States after the Internal Revenue Service denied their claim for a refund of taxes and interest, which *288 they claim were erroneously assessed and collected by the defendant. Plaintiffs allege that they are entitled to a refund because the Internal Revenue Service failed to consider the loss in value to their adjoining property when the agency calculated the fair market value of the property which the plaintiffs donated to the L-A-D Foundation, Inc. and claimed as a charitable contribution deduction pursuant to Section 170(c)(1) of the Internal Revenue Code.
This case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. Plaintiffs Leo A. Drey and Kay K. Drey, his wife, are citizens of the United States and residents of St. Louis County, Missouri.
2. Prior to July of 1970, plaintiffs acquired 26 non-contiguous tracts of riverfront land in southeastern Missouri, scattered along both banks of the Current and Jacks Fork Rivers; 25 of these tracts are situated in Shannon County and 1 in Carter County, Missouri.
3. Plaintiffs' tract extended various distances from either the ordinary low water marks, or banks of the rivers, but in no case less than 800 feet.
4. The tracts were wooded and unimproved except for 1 abandoned schoolhouse and various roads and trails.
5. On July 23, 1970 plaintiffs executed and delivered to the United States an Exchange Scenic Easement Deed. The property affected by the easement was 961.47 acres of riverfront land, consisting of the 300 foot strip of land contiguous to the low water mark of the river bank in each of the 26 parcels. The deed imposed restrictions upon the land and required the landowners to refrain from certain activities. The plaintiffs retained the fee on the 961.47 acres as well as the unencumbered fee on contiguous parcels. The terms of the Scenic Easement Deed are as follows:
WHEREAS, pursuant to the authority contained in an act of Congress enacted August 27, 1964, Public Law 88-492, the parties hereto have agreed to an exchange of lands located within the authorized boundaries of the Ozark National Scenic Riverways, for land of approximately equal value which lies outside the boundaries, but excess to the requirements thereof.
* * * * * *
The scenic easement restrictions hereby imposed upon the use of said lands and the acts which the parties of the first part so covenant to refrain from doing upon the said hereinafter described lands are and shall be as follows:
1. Prohibiting ingress and egress over and across and use by the general public of any or all of the herein-described lands * * * for such purposes as are not inconsistent with the restrictions and purposes of said scenic easement.
2. Using the said lands for mining or industrial activity or for any purposes whatsoever except for noncommercial residential purposes or for such additional purposes as may be authorized in writing on such terms and conditions deemed appropriate by the Secretary of the Interior or his authorized representative. But the parties of the first part shall not be precluded hereby from farming the land nor from grazing livestock thereon provided the same be done in conformity with good husbandry practice. The permitted use for farming and grazing shall include the harvesting of timber, and gathering firewood for personal use but only from selected areas which the Park Superintendent may approve.
3. Erecting or building any structures on said lands, including major alterations to existing buildings, except as may be authorized in writing by the Secretary of the Interior or his duly authorized representative. * * *

*289 4. Permitting any change in the character of the topography of said lands other than that caused by the forces of nature....
5. Permitting the accumulation of any trash or foreign material which is unsightly or offensive.
6. Cutting or permitting to be cut, destroying, or removing any timber or brush, except as may be authorized in writing by the Secretary of the Interior or his duly authorized representative. Provided, however, that seedling trees or seedling shrubbery may be grubbed up .... [for] good farm practice on lands presently being cultivated or for residential maintenance purposes....
7. No trailer shall be placed, used or maintained on said lands as a substitute for a residential building or other structure, and no sign, billboard, or advertisement shall be displayed or placed upon the land....
By acceptance of this deed, the party of the second part specifically agrees for the purpose of the parties of the first part retaining their present means and rights of ingress and egress, that the parties of the first part, their heirs, successors and assigns, or invitees, shall not be required to pay, when proceeding directly to and from such lands, park entrance or road fees.
6. On June 28, 1974, plaintiffs executed and delivered to the L-A-D Foundation, Inc. a quitclaim deed by which plaintiffs conveyed "any right or title" in the 300 foot strip of property encumbered by the scenic easement. The L-A-D Foundation, Inc. was then an organization organized exclusively for public and charitable purposes within the terms of Section 170(c)(1) of the Internal Revenue Code.
7. Plaintiffs filed their 1974 personal income tax return and claimed thereon a charitable contribution deduction of $275,000.00 for the value of the property which they conveyed by quitclaim deed to the L-A-D Foundation, Inc.
8. Upon audit of plaintiffs' income tax liabilities for 1974, the Internal Revenue Service determined that the fair market value of the property contributed to the L-A-D Foundation, Inc. was $45,500.00. Pursuant to this determination, and other adjustments which are not at issue here, the Internal Revenue Service assessed against plaintiffs the amount of $160,650.00 in additional income taxes, plus statutory interest of $57,804.29. Plaintiffs paid these additional amounts on May 27, 1980.
9. On September 12, 1980, plaintiffs filed a timely claim for refund of the additional tax and interest, alleging that the property had been erroneously assessed and the taxes and interest erroneously collected. The Internal Revenue Service disallowed the claim for a refund on February 12, 1981. Plaintiffs thereafter timely instituted this action.
10. At trial the two experts who had initially appraised plaintiffs' property at $280,000.00 and $270,000.00 testified as to their methods of valuation of the fee underlying the scenic easement. Plaintiffs' appraisers McReynolds and Thornton used a "before-and-after" approach on the theory that sales of this nature do not occur in the market between knowledgeable parties. Plaintiffs' experts testified that the highest and best use of the adjoining properties retained by the plaintiffs prior to 1974 was wilderness recreation development on a low density basis. These contiguous properties comprise 1,602.45 acres and were readily suitable for subdivision into at least 240 lots for recreational and vacation cabins. McReynolds and Thornton testified that the market value of these adjoining properties and their use for recreational purposes was dependent upon the owner of these properties having title to the fee underlying the scenic easement which in turn assured access to the river. Therefore, the appraisals of plaintiffs' experts were based upon the significant reduction in the value to plaintiffs' contiguous parcels of properties resulting from the donation of the fee underlying the scenic easement and the loss of access to the river. The experts concluded that the value of plaintiffs' contiguous property was significantly reduced in the *290 amounts of $280,000.00 and $270,000.00 respectively. The experts also testified that the value of the fee underlying the scenic easement was minimal; the parcel of land with the old schoolhouse had a value of $6,000.00 to $7,000.00.
11. Defendant supported its determination of the fair market value of the scenic easement land by presenting the expert testimony of Joseph Wildt of the Internal Revenue Service. Wildt testified that the only profitable use of the property underlying the scenic easement was in timber operations because of the restrictions and prohibitions imposed upon the use of the land by the terms of the scenic easement. Wildt determined the total value of the standing timber by estimating the board feet of timber per acre and obtaining comparable sales of timber in the area during 1974. From that value Wildt discounted the total value of the timber by 45% because of the difficulty of access, the small size of the parcels, and the terms of the Exchange Scenic Easement Deed which required the owner of the fee to acquire Park Service approval for timber harvesting under paragraph 2 of the deed. Finally, Wildt evaluated the tract upon which the school house was located at $7,000.00 and added this amount to the value of the timberland to reach a total fair market value of the scenic easement land of $45,000.00. Wildt testified that he did not appraise the value of the adjoining strips of retained land because the plaintiffs had not contributed this land and because severance damages were not an appropriate consideration in an appraisal of land for income tax purposes.

CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1346(a)(1). Plaintiffs claim that they are entitled to a refund of federal income taxes because the Internal Revenue Service failed to include severance damages in its appraisal of the property donated to the L-A-D Foundation, Inc. and claimed as a charitable deduction by plaintiffs. Therefore, the question of law presented by this case is whether the reduction in value to adjoining properties is an appropriate consideration when calculating the fair market value of properties claimed as deductions.
Section 170 of the Internal Revenue Code provides for a deduction for contributions and gifts to or for the use of organizations described in Section 170(c).[1] In 1974 plaintiffs donated their fee underlying the scenic easement to the L-A-D Foundation, Inc.; the foundation was an "organization" as that term is defined within Section 170(c). See Findings of Fact Nos. 6-7. For purposes of determining the amount of a charitable deduction the Code further provides that if a charitable contribution is made in property other than money, the amount of the charitable deduction is the fair market value of the property at the time of the contribution. The fair market value is the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Treasury Regulations on Income Tax (1954 Code) (26 C.F. R.), 1.170A-1(c); Revenue Ruling 76-376, 1976-2 Cum.Bull. 53; Fitt's Estate v. Commissioner, 237 F.2d 729 (8th Cir. 1956). It is evident that this general standard does not resolve the question of whether gain or loss to adjoining retained property should be considered when determining the fair market value of property claimed as a charitable deduction under Section 170(c) of the Internal Revenue Code.[2]
In an effort to support their contention that severance damages are an essential *291 component for the fair market value of property contributed as a charitable deduction, plaintiffs assert that the rule for condemnation cases and income tax cases are the same. The standard for valuing property taken for public use or condemnation "consists not only in an award of the value of lands which are taken, but also of any damage that may result to the portion of the tract which remains..." Sharp v. United States, 191 U.S. 341, 351-52, 24 S.Ct. 114, 116, 48 L.Ed. 211 (1903). In order to comply with the requirement of just compensation embodied in the Fifth Amendment of the Constitution, courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings. United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). However, severance damages become an essential element of properties taken for purposes of condemnation only if the government takes a portion of a parcel of land which has been used and treated as an entity. 317 U.S. at 376, 63 S.Ct. at 281. Therefore, it is clear that the Constitution has never been construed to require payment of "consequential damages" whenever the government takes a separate tract of the owner in eminent domain proceedings. Id.
It is evident that severance damages are not always an element of the fair market value of properties taken in condemnation proceedings. United States v. Miller, supra; Sharp v. United States, supra. Therefore, there is validity to the proposition presented by the defendant that severance damages to remaining property are added to the fair market value of the property taken for the purpose of reaching just condemnation under the Fifth Amendment in condemnation cases.[3] More importantly, the assessment of the fair market value of property in condemnation proceedings involves certain considerations that are not necessarily present when valuing property donated and claimed as a charitable deduction. The measure of compensation in condemnation proceedings is a substantial right guaranteed by the Constitution of the United States. United States v. Miller, supra. In addition, the concept of just compensation requires that "no private property [may] be appropriated to public uses unless a full and exact equivalent for it be returned to the owner." Olson v. United States, 292 U.S. 246, 254, 54 S.Ct. 704, 708, 78 L.Ed. 1236. Finally, condemnation proceedings involve a "taking" which often require a property owner to part with his property involuntarily. None of these considerations is present under the facts of this case. Therefore this Court is unable to accept the proposition that the method of valuing the fair market value of property in condemnation proceedings is the same as the method of valuing property claimed as a charitable deduction.[4] This Court believes *292 it is free to examine the purpose when determining the fair market value of property donated or condemned. The Supreme Court recognized the problem in valuing property which has no real market: "[w]hen, for any reason, property has no market value, resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect the value with nicety." United States v. Miller, 317 U.S. at 374, 63 S.Ct. at 280.
It is clear that the concept of just compensation and the Fifth Amendment require the government to fully compensate the seller for any detriment that has been suffered. Therefore the payment of severance damages will be a valid consideration in condemnation proceedings. However, the value of property donated as a charitable contribution should be evaluated by determining the fair market value of the property donated by the taxpayer to the charitable organization.
Under the circumstances of this case, plaintiffs freely chose to donate their property to the L-A-D Foundation by executing a quitclaim deed by which plaintiffs conveyed "any right or title" in the 300 foot strip of property encumbered by the scenic easement.[5] Therefore, the considerations that arise in condemnation proceedings when assessing the fair market value of property taken by the government, do not arise under the facts of this case. The measure of compensation is not a substantial right guaranteed by the Constitution when property is donated as a charitable contribution. Therefore, this court believes that it is free to assess the fair market value of the land donated by the plaintiffs, by determining the value of the property donated by the taxpayer to a charitable organization. Under this standard, severance damages are not a valid consideration. Therefore, it is the conclusion of this court that the taxpayers have failed to sustain their burden of showing that the Commissioner's determination is invalid. Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935).
Accordingly, judgment will be entered for the defendant.
NOTES
[1] Section 170(c) is subject to various limitations which are not relevant to this cause of action.
[2] It is evident that neither of the values estimated by the parties in this action would allow for a mutually willing buyer and seller. The taxpayers would have been unable to find a willing buyer at the price determined by their appraisal of the fair market value of the fee underlying the scenic easement; and the taxpayers would not have been willing to sell the property at the price set by the Internal Revenue Service.
[3] The government also argues that Revenue Ruling 76-376, 1976-2 Cum.Bull. 53 supports the proposition that when determining the fair market value of property contributed for purposes of charitable deduction, gain or loss to adjoining retained property is never considered. Although the Internal Revenue Service did not look at the detriment to the retained 2 acres when valuing the 8 acres for purpose of charitable contribution deduction, it is not clear that the issue of severance damages was before the agency at this time. Therefore, the Court cannot accept the argument that this Revenue Ruling conclusively demonstrates that severance damages is not a valid consideration when valuing property contributed pursuant to Section 170 of the Internal Revenue Code.
[4] This Court takes note of the fact that plaintiffs find some support for the proposition that the rule of valuation for income tax purposes is the same as the rule in condemnation proceeding in Benjamin Klopp, 19 TCM 973 (1960). In that case the court held: "in determining the fair market value of that portion of petitioner's property which was contributed under threat of condemnation to the United States, so-called `severance damages' to adjacent property retained by plaintiff are an intrinsic and integral part of the fair market value of the property contributed." 19 TMC at 977. However, this case may be distinguished from the facts of the case at bar on the grounds that the property "was contributed under threat of condemnation." Therefore the considerations present in condemnation proceedings were of concern in this case; the taxpayer was threatened with the loss of his property to the United States. Rather than lose his property to the government in condemnation proceedings he chose to give it as a charitable contribution.

There is also dicta in this decision which suggests that the fair market value is constant and does not vary according to whether the taxpayer is seeking a charitable deduction or just compensation for property condemned. 19 TCM at 977. In view of the fact that this Court believes that it is free to examine purpose when determining the fair market value of property it must reject dicta to the contrary contained in Benjamin Klopp, supra.
[5] This court would observe in passing that the L-A-D Foundation is a charity founded by the plaintiffs. Therefore it is unclear whether the plaintiffs might exercise any control over this property, as founders of this charity. However, this court recognizes that under the terms of the quitclaim deed the plaintiffs, as individuals, gave up any legal rights that they had in connection with the fee underlying the scenic easement.