LOUGHRY, J.,
dissenting:
In Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934), the United States Supreme Court recognized that the United States Constitution requires the owner of condemned land to be put “in as good a position pecuniarily as if his property had not been taken.” Id. at 255, 54 S.Ct. 704. Likewise, this Court confirmed this principle in State Road Commission v. Board of Park Commissioners, 154 W.Va. 159, 173 S.E.2d 919 (1970), stating that: “The guiding principle of just compensation is reimbursement to the owner for the property taken and he is entitled to be put in as good a position pecu-niarily as if his property had not been taken.” Id. at 167,173 S.E.2d at 925. Trampling upon this critical principle of eminent domain law, the majority has sanctioned the deprivation of fair market value to the landowner based upon costs uniquely and solely attendant to the State’s intended usage of the condemned property. In the present case, the State is attempting to deprive the innocent landowner of more than half of the land’s value. Such a result is manifestly unjust and ultimately threatens the rights of all property owners in this state. Recognizing a clear need to raise a clarion call because of the potential for both devastating and long-lasting effects to our body of eminent domain law, I adamantly dissent to the majority’s violation of the constitutional mandate of “just compensation” for private property taken for public use.
Before the State decided to condemn the subject property, the environmental contamination had not required any action by the prior landowners. The record establishes that the underground storage tanks began leaking in 1991 when the property was owned by Exxon. Sometime after the leak’s detection, Exxon sold the property to H.C. Lewis. A second leak occurred during H.C. Lewis’s *666 ownership of the subject property. The West Virginia Department of Environmental Protection (“WVDEP”) was aware of the leaks but did not require any remediation. Instead, monitoring wells were put in place and ground water samples were taken and analyzed on a regular basis. Subsequently, the property was sold to Chrite Properties for $400,000.00. Chrite Properties financed the purchase through MCNB and obtained a $750,000.00 loan from MCNB to construct and operate a Sonic fast-food restaurant on the property. When Chrite Properties defaulted on the loan in 2013, MCNB instituted a foreclosure proceeding and obtained title, paying $1,000,000.00, for the purchase. Less than a year later, the State gave notice of its intent to condemn the property.
The WVDEP has declared that “[t]he responsible party for remediation of petroleum contamination associated with the confirmed release is the owner(s) of the underground storage tanks at the time of the confirmed release.” Because MCNB did not own the subject property at the time the underground storage tanks began to leak, but for the taking, MCNB would have never incurred, or been liable for, the costs of remediation. Moreover, it appears that no remediation efforts would have been required as the twenty-year monitoring period was almost complete.[1]
Solely because of the State’s intended use of the property—the construction of a bypass road—has the issue of remediation even surfaced. It is well established that the proper measure of the value- of property taken through eminent domain proceedings is “the owner’s loss, not the taker’s gain.” State Rd. Com’n, 154 W.Va. at 167, 173 S.E.2d at 925. Indeed, this Court recently held: “Under the project influence rule, any increase or decrease in value to the condemned land that is directly attributable to the project for which the land is taken must be disregarded in determining the market value of the land.” Syl. Pt. 4, Gomez v. Kanawha Co. Com’n, 237 W.Va. 451, 787 S.E.2d 904 (2016). By allowing the State to deduct the remediation costs from the property’s appraised value, the majority, in clear contravention of Gomez, is permitting just compensation to be based on the property’s intended use rather than on the property’s value in the private marketplace. According to the majority, the valuation of the property is measured in terms of the property’s value to the State, rather than in terms of the loss of value - realized as a result of the taking by the property owner. This result flies in the face of established and equitable principles of just compensation.
To reduce a just compensation award because the condemnor’s project requires a different remediation than the owner would have undertaken in the private market is patently unjust. Using a hypothetical scenario that bears a striking resemblance to the case at bar, one commentator aptly illustrated “the potential for a real disconnect between the type and measure of remediation costs before and after a taking:”
A landowner using an old gas station site with historical hydrocarbon contamination may incur only minor remediation costs associated with bioremediation and ground water monitoring that have little effect on the property’s use or the income stream generated from it. Remediation expenses might even be reimbursable from a government fund associated with leaking underground storage tanks. When the con-demnor acquires the property for a below grade highway underpass project, however, it encounters heavily contaminated soil. Because of the project’s construction time-lines, the condemnor carts away several hundred truck loads of dirt in a short period, treating it all as hazardous material and incurring several million dollars in cleanup costs. These are real costs, but who should bear the brant of them? Should the entire cost be deducted from the just compensation owed for the property?
Jack R. Sperber, A Clean Look at Dirty Property: Emerging Issues and Common Problems When Valuing Contaminated Properties in Eminent Domain Proceedings, SS035 ALL-ABA 705, 711 (Feb. 2011). The *667 travesty of forcing MCNB to incur remediation costs is obvious: MCNB would have never incurred any remediation costs absent the taking because it was not the legally responsible party and because the current use of the land did not require it.
The method by which the fair market value of the property was reduced to account for the remediation costs is also problematic. The State’s certified general appraiser, Kent Kesecker, reported that the fair market value of the property, along with damages to the residue, is $1,012,500.00. West Virginia Code § 54-2-14a (2006) provides, in part:
Before entry, taking possession, appropriation, or use, the applicant [the State] shall pay into court such sum as it shall estimate to be the fair value of the property, or estate, right, or interest therein, sought to be condemned, including, where applicable, the damages, if any, to the residue beyond the benefits, if any, to such residue, by reason of the taking.
Ignoring this clear statutory mandate, the State revised Mr. Kesecker’s appraisal by subtracting the estimated remediation costs from his reported fair market value. This type of dollar for dollar discounting, while simple to administer, “has little else to commend it” because “it rarely captures the property’s true value.” Sperber, SS035 ALI-ABA at 719. In that regard, any actual reduction in fair market value due to the contamination “may be far more or far less than those anticipated costs depending on the circumstances involved.” Id.
In this case, the dollar for dollar reduction of the fair market value is particularly troubling because it was based on a single estimation of the remediation costs. During the hearing below, the State acknowledged that “these exact numbers [for the remediation] ... arise from an estimate that was done by an expert—a consultant retained by the Division of Highways—/or this specific project.” (emphasis supplied). According to the deposition of WVDOH civil engineer Sajid Barias, the estimated proposed alternative viable options for performing the recommended remediation ranged as low as $100,000.00 and $225,000.00. Mr. Barias further testified that the “Stage 1” estimate of $519,000.00 could be performed for approximately $225,000.00 with “some of the work being done by DOH” rather than a private contractor and “using our own equipment.” As this testimony demonstrates, the $595,000.00 estimate for remediation was highly inflated. Moreover, it suggests that the estimate was derived from wholly speculative remediation costs' rather than from costs likely to be paid by the State.
In any condemnation case the relevant question is: How would the private marketplace have treated the environmental issue in determining the fair market value as of the date of the taking, without any consideration of the project for which the property is being condemned? In this instance, we know that the contamination had almost no effect on the fair market value of the property because, even though the leak occurred more than twenty-years ago, no action other than groundwater monitoring has been required. Despite the contamination, the property has been sold on multiple occasions and even developed for other commercial uses, namely a restaurant. Proof of its continuing value is the fact that the property was acquired by MCNB for $1,000,000,00 shortly before this eminent domain proceeding was instituted. Because the contamination had no impact on the property’s fair market value before the condemnation, it stands to reason that the State’s costs of remedying the contamination should not be considered in determining the just compensation due to the landowner.
Apparently motivated by a desire to help the State avoid paying the costs associated with the property’s clean up, the majority overlooks the existence of an alternative remedy for recouping the remediation expenses. The State can institute an environmental cost-recovery action pursuant to the governing environmental laws against the parties actually responsible for the contamination. Such an action not only allows the costs of remediation to be transferred to the entities who are actually responsible for the contamination, but it prevents an innoeent landowner—MCNB—from being penalized for a problem it did not create.
*668 In addition to the substantive basis for this dissent, there are also procedural impediments to the majority’s decision. Through its petition for extraordinary relief, the State sought to “prohibit” enforcement of a ruling that was merely the preliminary determination of the fair market value. The statutory process provides for just compensation to be determinated by a report of condemnation commissioners or a verdict of a jury, which is subject to review through the normal appeal process. See W.Va. Code § 54-2-14a. By granting the State the relief it sought, the majority has disregarded our well-established tenets regarding the grounds for issuing a writ of prohibition. See Syl. Pt. 4, Hoover v. Berger, 199 W.Va. 12, 483 S.E.2d 12 (1996). We have long held that where a party has other adequate means of seeking relief, such as direct appeal, a writ of prohibition should not be granted. Id.
The effect of this decision is to place all property owners in a highly undesirable position as it sanctions an improper undervaluation of condemned land from the initiation of eminent domain proceedings. As a result, landowners will be forced to resort to costly litigation in an effort to obtain just compensation because the State can now take property immediately for a mere fraction of its fair market value if the State’s intended use creates a colorable excuse for reduced compensation. Obviously, the construction of highways will frequently involve costs that would never arise when the property is being put to its ordinary use for commercial or residential purposes. If the State can pass on those extra costs to innocent landowners by reducing the compensation to which they are constitutionally entitled, basic principles of equity and fairness will necessarily be frustrated. By condoning the State’s revision of its certified appraiser’s report to account for the remediation costs, the majority is allowing the State to determine fair market value of land in future eminent domain proceedings by using whatever method the State arbitrarily decides is appropriate.
In conclusion, simply because the State decided to take MCNB’s property, the majority has decided that MCNB must pay the costs to clean up an environmental mess caused by a previous property owner. Consequently, MCNB is being forced to incur a financial loss that it otherwise never would have sustained solely because of the State’s intended use of the property. The majority’s decision has worked a travesty of justice because MCNB is being denied the just compensation to which it is constitutionally entitled. Accordingly, I respectfully dissent.

. According to the deposition testimony of a WVDEP official, the "wait and see” approach of conducting quarterly water samples would have likely continued had the DOH not decided to condemn the property in order to build a road.