**UNITED STATES of America,
Plaintiff,
v.
1.16 ACRES, MORE OR LESS, IN the CITY OF STAMFORD, COUNTY OF FAIRFIELD, STATE OF CONNECTICUT and Arthur E. Doane, et al., Defendants.**

Civ. No. 11202.

United States District Court
D. Connecticut.

June 24, 1969.

Stewart H. Jones, U. S. Atty., District of Connecticut, by David Margolis, Asst. U. S. Atty., Hartford, Conn., for United States of America.

Slavitt & Connery, Norwalk, Conn., for Trio Const. Co., Inc.; Abraham D. Slavitt and Robert G. Zanesky, Norwalk, Conn., of counsel.

MANSFIELD, District Judge.*

In this action pursuant to various acts of Congress (40 U.S.C. § 258a and acts supplementary thereto and amendatory thereof; 33 U.S.C. § 592; and 33 U.S.C. § 701) for the condemnation of a tract of 1.16 acres of land for a local harbor flood control project in Stamford, Conn., the sole issue presented for trial, which was held on June 10, 12 and 13, 1969, was the amount to be paid to Trio Construction Company, Inc. ("Trio" herein) as just compensation for that portion of the condemned acreage known as Tract No. 35, owned by Trio.

The essential undisputed facts are as follows: Tract No. 35 is a pie-shaped piece of land, 3,042 square feet in acreage, forming a part of a larger irregularly shaped piece of land, 25,446 square feet in acreage, owned by Trio and located at the corner of Seaview Avenue and White Street, Stamford, Connecticut. On December 10, 1965, the Acting Secretary of the Department of the Army filed in this Court a Declaration of Taking of the aforementioned 1.-16 acres, including Tract 35, for the purpose of constructing a stone hurricane barrier as part of a harbor flood control project known as the "Stamford Harbor Protection Project, Stamford, Connecticut." Trio thereupon became entitled as just compensation to the fair market value of Tract 35 and any loss in fair market value of the residue of the larger piece of land owned by Trio resulting from the taking, fixed according to the highest and best use to which the property was adapted at the time of the taking. United States v. Jones Beach State Pkwy. Authority, 255 F.2d 329 (2d Cir.), cert. denied, 358 U.S. 832, 79 S.Ct. 55, 3 L.Ed.2d 71 (1958). Both sides agree that the measure of just compensation should be the difference between the fair market value of the entire piece of land, including Tract 35, before and after the taking. In this connection "fair market value" is defined as the price that would be paid in a competitive market, under all conditions requisite to a fair sale resulting from negotiation between a willing buyer and seller, each acting prudently, with knowledge of the essential facts and without undue pressure. Westchester County Park Comm. v. United States, 143 F.2d 688 (2d Cir.), cert. denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944).

The highest and best use for the land owned by Trio prior to the taking was as a site for a garden-type residential apartment building. In fact Trio had acquired the property on June 16, 1965 for $50,000 for just such use; plans and specifications for a 26-unit garden-type apartment had been drawn, a building permit had been obtained from the City

* Of the Southern District of New York sitting by designation.

of Stamford, test holes had been drilled on the property, and some bids had been obtained and some contracts entered into with respect to various aspects of the proposed apartment house. Construction of the apartment house as designed by Trio, however, was rendered impracticable by the taking for the reason that the Government's harbor flood control project, which has since been completed, called for a hurricane wall on White Street and a ramp on Seaview Avenue that would have (and has since had) the effect of eliminating all ingress and egress from the land except for a 25-foot strip along Seaview Avenue. We must therefore first determine the fair market value of the entire piece of land as of December 10, 1965, the date of the taking.

Although determination of fair market value of a parcel of land is not controlled by rigid rules or formulas and each case must be decided on its own facts, normally the most persuasive evidence of value is a recent sale of the land being condemned or of comparable property in the same vicinity, provided such sales are not too remote and the conditions in the case of comparable sales are substantially similar to those existing at the time of taking. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); United States v. 18.46 Acres, 312 F.2d 287, 288 (2d Cir.1963). In addition to comparable market data, however, we may consider other evidence of value such as cost, rental or other income derived from the land, and prospective income, particularly where comparable market value is unavailable or of doubtful probative value. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir.), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); United States v. 1.108 Acres of Land, 204 F.Supp. 737 (E.D.N.Y.1962). The weight to be given to opinion evidence based on such other methods of determining value depends, of course, on the nature of the data or estimates upon which such evidence is founded. United States v. 25.406 Acres of Land, 172 F.2d 990 (4th Cir.), cert. denied, 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738 (1949). In short, any opinion, whether derived from comparable sales, cost or income (past or prospective) is only as convincing as the foundation data upon which it rests.

Trio called as expert witnesses two real estate appraisers, Peter C. Robinson and Francis G. Brennan, who testified that the value of Tract 35 at the time of the taking was $98,917 and $106,000, respectively. Although there were some differences in the analytic approaches of these two witnesses, both utilized the same fundamental method. Both determined the residual value of the land as if the apartments planned by Trio had already been constructed and were earning income. This method required the appraisers to postulate the cost of the construction project, the rental income to be derived from the apartments, and the operating expenses which would be incurred. After determining the annual net income, the proportion of that amount attributable to the improvements was calculated and the remainder was capitalized to determine the residual value of the land.

Although the Court of Appeals for the Second Circuit has held it to be improper to value property "as if it were actually being used for the more valuable purpose," United States v. Meadow Brook Club, *supra*, 259 F.2d at 45, the adaptability of a particular tract to a more profitable use, and estimates of income to be derived from it as a site for such use, may properly be considered as factors affecting its fair market value. United States v. 25.406 Acres, *supra*, 172 F.2d at 995. While specific plans, including the obtaining of necessary zoning changes and a building permit, had here been completed, an examination of the underlying bases of the conclusions of Trio's experts discloses the dangers in attempting to value property by capitalization of estimated possi-

ble future income from apartments not yet constructed.

Such substitution of speculation in place of actuality can result in valuations that are too tenuous to be entitled to much weight. A fundamental problem encountered in the use of the "cost-income" approach in the case of an apartment still in the planning stage is that a relatively slight error in prognistication with respect to the estimated cost, income, or operating expenses of the prospective enterprise results in a disproportionately large variation in the ultimate residual land value. By way of example in the present case, an increase in construction costs of $50,000 would reduce the land value calculated by Robinson to about $29,500 and Brennan's calculated value to about $41,800. In other words, an increase of about 25% in construction costs (not an unusual occurrence in the period of rising construction costs experienced by this country over the past 10 years) would have reduced the residual land values arrived at by these experts by approximately 70% and 62%, respectively.[1] Furthermore, with respect to the Robinson appraisal an increase in operating expenses or a decrease in rental income of $1,000 would result in a corresponding decrease in land value of over $15,000; a similar deviation would decrease the Brennan appraisal by over $14,000.[2] Furthermore, there were factors entering into the relevant cost, income, and expense calculations which made it likely that substantial adjustments in the figures would be required after actual construction and operation of the apartment complex. The appraisers relied largely upon cost figures submitted to them by Trio, of which many were based upon estimates rather than upon an actual contract price. There was also testimony that the cost figures failed to account sufficiently for Trio's return on its service as general contractor for the construction project. The rental income and operating expense figures were not based upon actual experience but upon what amounts to informed guesses. In light of the uncertain nature of this underlying data and the disproportionate effects on residual land value that any error in the underlying data would have, little if any weight can be given to the calculations of defendant's experts based on the cost-income capitalization approach to value.[3]

The government also called an appraiser, Norman R. Benedict, who testified that the value of the land as of the time of the taking was about $40,000, based upon comparisons with the selling

---

1. The annual net income determined by Robinson was $24,835. Of this $18,406 was attributed to return on the improvements; a $50,000 increase in construction costs would, however, increase this return to $22,906. The income allocable to the land would be reduced to $1,929 which, capitalized at Robinson's rate of 6.5%, would yield a land value of $29,500, or approximately 30% of Robinson's $98,917 figure.

The annual net income determined by Brennan was $24,923, of which $17,494 was attributed to the improvements. A $50,000 increase in construction costs would increase the amount attributed to improvements to $21,994 thus reducing the income allocable to land to $2,929. This latter amount, capitalized at Brennan's 7% rate would result in a land value of $41,800 which is about 38% of Brennan's $106,000 figure.

2. These figures are obtained by capitalizing $1,000 at Robinson's 6.5% rate and Brennan's 7% rate, respectively.

3. For instance, Trio planned to finance construction of the proposed apartment through a bank mortgage loan approximating $200,000 for which an application was made. At a 6.5% interest rate the annual debt service on this loan would amount to $13,000, reducing Trio's estimated net income from the prospective enterprise to less than $12,000. Experts called by both sides differed as to how this charge should be treated in calculating net income for capitalization purposes, and whether the risk involved in such a speculative venture called for a higher rate of return.

prices of what he regarded as comparable parcels of land. Although his method is not as fraught with peril as the approach of defendant's experts, a problem is posed in the utilization of comparable sales in this case by the fact that three of the comparable sales occurred at least 18 months before the taking while the fourth occurred about 21 months after the taking. Furthermore, the apartments erected on the land involved in the comparable sales differed substantially in size and design from those planned by Trio. Although the government expert's appraisal is based upon more certain data than the appraisals of Robinson and Brennan, we conclude that we cannot be bound by any of the appraisals submitted by either party in reaching our determination of value.

The one sale which appears to us of dominant relevance in determining land value here is the sale of the subject property itself to Trio at a price of $50,000 on June 15, 1965 (or about six months before the taking) pursuant to a contract signed April 26, 1965. At the time of that sale both the seller and buyer were aware of the highest and best use of the land. Neither party was under pressure to sell or buy and neither was unwilling to enter into the transaction. The sale, therefore, was the type upon which a determination of market value may be based—a sale between a willing buyer and willing seller each acting free from pressure and with full knowledge of the pertinent facts. We, furthermore, find it appropriate to add to this $50,000 figure an increase in value resulting from Trio's formulation of plans and obtaining of a building permit. We do not believe that the increase in value approaches the estimates testified to by defendant's experts for the reason that it was well known when Trio

bought the land what the highest and best use was, and zoning for such use had been secured before the April 26, 1965 contract. Furthermore the plans were drafted and building permit was obtained in short order, the latter being issued on May 12, 1965. However, we do conclude that the existence of the plans and issuance of the permit would have influenced a buyer to pay approximately an additional $5,000 for the land in December, 1965, since it had been made clear that such a project was feasible and would be allowed by the city.[4] In addition, all witnesses were in agreement that 1965 was a year of rising real estate values generally in the relevant market. For this reason we find it appropriate to add an additional $2,000 to the value of the subject property to reflect the general upward trend in the market.

We, therefore, conclude, after having viewed the property, studied the appraisals submitted by the experts in the light of their testimony, and heard the testimony of the owners of Trio as to their dealings with respect to the property, including their obtaining the property six months prior to the taking for $50,000, their plans for its development, and the steps already taken toward improvement by the time of the taking, that the preponderance of the evidence establishes that the fair market value of the property at the time of the taking was $57,000.

■ It is next necessary to determine the value of the portion of the tract remaining after the taking. There was a dispute among the experts as to the present highest and best use of the property. Mr. Benedict was of the opinion that garden apartments may still be profitably built upon the land, while defendant's experts agreed that the land

4. In this connection we have considered the evidence that Trio incurred expenses of about $15,000 in obtaining the plans and other preliminary steps. While there cannot be compensation for the amount of these out-of-pocket expenses since the government did not appropriate the architectural drawings or other plans formulated by or for Trio, the steps taken toward commencement of the project have been considered insofar as they would enhance the value of the land itself to a prospective buyer.

**1026**

is, in its present state, suitable only for storage or parking use. On the basis of our view of the property and the testimony of both the experts and the owners of Trio we conclude that the preponderance of the evidence indicates that the land is probably not suitable for apartment use. Access and ingress has been severely curtailed by the construction of the hurricane wall and the elevation of Seaview Avenue. White Street has been completely eliminated, and sewer connections eliminated on that street and made very difficult on Seaview Avenue. While the 25-foot opening on Seaview Avenue might be usable as a single entrance and exit for automobiles and pedestrians, it would render the site undesirable as an apartment site, probably resulting in lower rentals. This factor, coupled with the increased costs accompanying the restriction on ingress and egress would probably render the project uneconomic. Very little evidence was adduced at trial as to the value of this land for the purpose of parking or storage. Mr. Robinson merely reduced the unit value per square foot of the land according to his calculations by 85% and made the appropriate adjustment. Mr. Brennan did attempt to postulate the income which would be earned from seasonal parking of cars on the premises as well as storage of boatyard or marine equipment, but did not attempt an alternative calculation based upon boat storage, although he did suggest this as an alternative. We conclude that an efficient use of this parcel for an optimum combination of car and boat or other marine equipment storage would yield an income in excess of Mr. Brennan's estimate by a modest amount, sufficient to increase the fair market value of the land to $13,000.

We conclude that the value of the land before the taking was $57,000, the value of the remainder after the taking was $13,000, and that, therefore, Trio is entitled to just compensation in the amount of $44,000.

Settle order.