415 F.2d 265
 UNITED STATES of America, Plaintiff-Appellant-Appellee,
v.
CERTAIN LAND, together with the improvement thereon, located
AT the northwest corner of IRVING PLACE AND 16TH STREET,
etc., and Benjamin Kaufman, et al., Defendants, 396 Corp.,
Jacob Freidus and the Executors of the Will of Samuel E.
Aaron, Defendants-Appellees-Appellants.
 Nos. 605, 606, Dockets 31181, 31182.
 United States Court of Appeals Second Circuit.
 Argued May 21, 1969.
Decided Sept. 4, 1969.
 
 Martin Paul Solomon, Asst. U.S. Atty. (Robert M. Morgenthau, U.S. Atty. for Southern Dist. of New York, Roger P. Marquis and Edmund B. Clark, Attys., Dept. of Justice, on the brief), for plaintiff-appellant-appellee.
 Stuart A. Summit, New York City (Miller & Summit, New York City, on the brief), for defendant-appellee-appellant Jacob Freidus.
 Marshall Perlin, New York City, for defendant-appellees-appellants 396 Corp. and the Exrs. of Will of Samuel E. Aaron, Milton H. Friedman, New York City, of counsel.
 Before LUMBARD, Chief Judge, FEINBERG, Circuit Judge, and TIMBERS, District Judge.[1]
 LUMBARD, Chief Judge:
 
 
 1
 This appeal by the United States and cross-appeal by the defendants challenge that portion of the condemnation award rendered by the district court which is based on the 'risk of vacancy' created upon the subject building by the unique short-term option aspect of the takings exercised by the government. The United States contends that there should be no award for the risk of vacancy factor, while defendants maintain that the award is insufficient.
 
 
 2
 We reverse, because we find that the risk of vacancy award of $555,833.33 far exceeds the actual economic loss suffered by defendants as a result of the options. But because the record indicates that the options did have a direct adverse economic effect upon defendants we remand to the district court so that it may take further evidence and arrive at a fair valuation of defendants' loss caused directly by the options.
 
 
 3
 The subject property is the Borgfeldt Building, constructed in 1909, an eleven story loft structure located at the northwest corner of Irving Place and East 16th Street in Manhattan, which the government used for offices. From 1945 through 1947 the government was in possession of the premises under a sublease, but after 1947 the possession was extended by four condemnations. The defendants in this litigation were first the owners and later the lessees of the building under a sale and lease-back transaction during the years covered by this proceeding, July 1, 1960 through June 30, 1964.
 
 
 4
 The government initiated its first condemnation proceeding in 1947. This was a taking for one year but with the added provision, as was true in the succeeding takings, that the government could exercise options for the use and possession of premises for each of the next four years. The only condition upon its exercise of these options was that notice be given at least 30 days prior to the expiration of each yearly term. A similar proceeding, once again providing for a one year term and options to extend for a maximum of four additional years, was initiated in 1953. The third taking, instituted in 1958, was identical to the two previous except that the options extended only for three years past the initial term. Finally, a fourth taking was instituted in 1962, with the options extending for four years past the initial term. This litigation involves the last two years of the third taking, i.e., 1960 through 1962, and the first two years of the fourth taking, i.e., 1962 through 1964.
 
 
 5
 The parties do not object to the basic fair rental value found by the district court for the years in question. This value was set by the court at $230,000 per annum, after it declined to adopt the government expert's figure of $207,500, and the defendants' expert's figure of $385,000, the latter estimate taking into account the options. The disagreement centers on the additional awards for the 'risks of vacancies'-- i.e., the risk that the building would stand vacant if the government did not exercise one of its short notice options and defendants were not able to secure immediately another tenant. The government contends that no award should have been made for this risk, since in fact the government exercised all of its options and thus no actual vacancies occurred. The defendants contend that the award was inadequate as it does not take into account the risk of vacancy for each of the four years, but rather proceeds on the assumption that there was only one risk for each of the two-year takings.
 
 
 6
 The theory behind the risk of vacancy award requires some explanation. Under the terms of the takings the government was not required to exercise its option for the coming year until 30 days prior to the expiration of the current yearly term. Thus with respect to each of the four years in question it was possible for the government to give notice thirty days prior to the expiration of the yearly term that it would not exercise its option for the coming year. This would have left the defendants with their building standing vacant until they were able to secure new tenants. Due to the large size of the building this task of securing new tenants might occupy a considerable period of time, during which the property would be producing no income.
 
 
 7
 The district court found that it would take 18 months for the owners of the Borgfeldt Building to obtain and install a new tenant after receiving notice that the building would become vacant. From this the court concluded that the fair market value of the option was equal to the fair rental value for the eighteen month period during which the building would remain vacant if the government had not exercised its options. The actual risk of vacancy award was for only seventeen months rent, since under the taking the government obligated itself to give 30 days notice.
 
 
 8
 The situation concerning the years 1960 and 1961 is slightly different owing to the outcome of the previous litigation affecting the government's third taking. Judge Knox, in a ruling that was affirmed by this court, United States v. 396 Corp., 264 F.2d 704 (2d Cir.), cert. denied, 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959), modified the notice provision by requiring the government to give six months notice of its intention to exercise or not exercise the option. While that litigation itself concerned only 1958, the district court in the present case found that the six months notice had been given also in 1960-61 and 1961-62. Thus in figuring the risk of vacancy for these two yearly periods the district court subtracted six months from the 18 month vacancy period, and then awarded as compensation for the option the rental value for a 12 month period.
 
 
 9
 In addition, since 1962 was to be the last year of occupancy under the third taking, this amounted to a 12 month notice. This, when combined with the six month notice ordered in 1961 by Judge Knox, eliminated any risk of vacancy in 1962.
 
 
 10
 The above calculations resulted in a risk of vacancy award of $230,000 for the last two years of the third taking, i.e., 1960-62 and $325,833.33 for the first two years of the fourth taking, i.e., 1962-64, for a total risk of vacancy award of $555,833.33, plus interest.
 
 
 11
 We reject the government's contention that the previous consideration by Judge Knox of the value of the options held by the government for the years 1956 through 1960 barred defendants, by virtue of collateral estoppel, from introducing proof relating to the valuation of the options for the years 1960 through 1964 in this litigation. Judge Knox, as noted above, required the government to give six months notice of its intent to renew or not to renew. The government points to the language of this Court in affirming Judge Knox 'that the landlord was awarded all that, in all conscience, it was entitled to, under the Constitution.' United States v. 396 Corp., 264 F.2d 704, 708 (2d Cir. 1959). Since the terms of the taking reviewed by Judge Knox and that of the takings involved in the present litigation are identical, the government submits that defendants are barred from relitigating the value of the options.
 
 
 12
 But neither Judge Knox nor this Court purported to set a value on the options. Instead Judge Knox attempted to reach a result justified by the limited evidence presented to him with respect to the options. If, in this litigation, defendants are able to submit additional evidence which establishes some element of direct economic loss to them as a result of the options, then we believe they are entitled to an award increased by this amount. Because of the repeated options taken by the government the defendants have been forced to bear the burdens of litigation for each yearly period for which the parties have been unable to agree on an appropriate rent. With this burden of repeated litigation should go the benefit of being permitted to introduce new evidence for the purpose of establishing defendants' right to a higher condemnation award.
 
 
 13
 The basic identity of factual and legal issues necessary for the invocation of the collateral estoppel doctrine is not present here. As we discuss below, the measure of the award which defendants may recover due to the existence of the options is the value of what they have lost as a direct result of the options. It is quite conceivable that the defendants might suffer no provable damage by virtue of the options in one year, and yet sustain sizable loss in a future year when, for example, their active attempts to secure mortgage financing are defeated because of the option factor. This, then, is not a situation where from year to year the impact of the options remains 'substantially static, factually and legally,' Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 599, 68 S.Ct. 715, 92 L.Ed. 898 (1948), and therefore defendants are not estopped.
 
 
 14
 Neither do we think that defendants should be barred from attempting to prove this element of damage because of the government's alleged reliance on the result reached by Judge Knox with respect to the options. The government chose to proceed with respect to this property by a short term option procedure which has had the effect of keeping the defendants in suspense with respect to the government's exercise of its renewal right for each future year. Since defendants were unable to rely on the government's continued possession of the premises beyond each current year, it is not unfair to require that the government face some uncertainty concerning the eventual condemnation award for each year. If certainty were its goal the government could have condemned the property for a fixed term of several years, and thus eliminated the options as a factor creating uncertainty for both it and the condemnees. Once again, having chosen the benefit of retaining for itself the options the government must accept a share of the unpredictability of the fair price to be paid.
 
 
 15
 But while we agree with the district court that defendants were entitled to an opportunity to establish their right to an additional award due to the options, we find that the award of $555,833.33 far exceeds any direct economic loss sustained by the defendants, so far as the present record discloses.
 
 
 16
 In setting a condemnation award 'the question is, What has the owner lost? not, What has the taker gained?' Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910); United States v. John J. Felin & Co., 334 U.S. 624, 630, 68 S.Ct. 1238, 92 L.Ed. 1614 (1948). Usually the award is premised on a finding, however derived, of the fair market value of the property interest taken. In this case a comparison with transactions in the free private market is not possible, for the evidence established that short-term options of the type taken by the government in this instance would never be given by an owner of a building like the Borgfeldt Building unless there were no rental market for the building. In light of this fact we must look to all the surrounding circumstances to determine the value of what the defendants actually lost by virtue of the short-term options held by the government during the four years in question.
 
 
 17
 It cannot be said that the defendants lost eighteen months rent, or any lesser period of rental income, because of the options. It is true that the options created a risk of such a loss, but it was a risk of vacancy which did not materialize. In each of the four years the government in fact did exercise its option to renew, and thus the defendants received the full fair rental income from the building, as set by the district court, during this period. Since the defendants lost no rental income, they are not entitled to a condemnation award simply because from year to year it was possible that they would not receive this income. An award for the risk of vacancy such as the district court ordered would result in double compensation; the defendants would obtain not only the rental income paid by the government, but also an award for the risk that they might not have received it.
 
 
 18
 The defendants contend that we should close our eyes to the events occurring subsequent to the government's taking, namely the exercise of the options by the government, and instead place a value on the existence of the options as of the initiation of each taking. Viewed from this point in time the risk of vacancy is still impending, and requires, defendants claim, some compensation.
 
 
 19
 We see no reason for ignoring the eventual exercise of the options in reviewing a condemnation award which is based upon their existence. A similar situation was presented to the Supreme Court in United States v. Westinghouse Electric Mfg. Co., 339 U.S. 261, 70 S.Ct. 644, 94 L.Ed. 816 (1950). In 1943 the government had condemned property for a one year term, but with the right to renew for additional yearly periods during the existing war emergency. Part of the property was leased by the defendant Westinghouse Company, under a lease that expired in 1944. Ultimately the government did exercise the right to renew, and occupied the property until 1945, beyond the termination date of the defendant's leasehold. The issue was whether Westinghouse's moving expenses, which it incurred in 1943 as a result of the government condemnation, but which as events transpired it would have incurred anyway in 1944 upon the expiration of its lease, should be included in the condemnation award. The Court, using hindsight, concluded that in actuality the government had taken the whole of Westinghouse's lease as the result of its renewals, and that therefore moving expenses were not recoverable in light of United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946).
 
 
 20
 The Court's observations in Westinghouse with respect to the use of hindsight are directly relevant to our case:
 
 
 21
 'The usual rule for ascertaining value at the time of taking is not disrespected if one item is made a function of the future because only then can it be known whether that item forms a part of what has been 'taken.' The alternative is to require a forecast of the possibility that the tenant will have to move back into the premises. The factors on which such a forecast must be based are too contingent, too unique for guidance by experience, to permit rational assessment. This is a situation where the law should express 'a judgment from experience as against a judgment from speculation". 339 U.S. at 267, 70 S.Ct. at 648.
 
 
 22
 Here, also, any attempt to place a value on the possibility that the government would not exercise its options, thereby changing the risk of vacancy into the fact of vacancy, would flounder on the uniqueness of these options and the contingencies surrounding their possible exercise. An alternative would be to adopt the district court's approach in effect of treating the risk of vacancy as if it represented a certainty of vacancy, and rendering an award equal to the full rental income of the probable period of vacancy. This course, as we have concluded above, would result in an impermissible windfall unrelated to the actual loss suffered by defendants. This, then, is a case where the courts must look to past events in order to render a rational condemnation award based on the loss to the condemnees. See United States v. Brooklyn Union Gas Co., 168 F.2d 391, 397-398 (2d Cir. 1948).
 
 
 23
 But while we do not believe that the district court's risk of vacancy award can be sustained, this does not mean that the defendants must receive no compensation at all for the options held by the government during the four years at issue. The government must pay just compensation for every property interest it takes insofar as the taking results in a direct loss to the condemnee. See United States v. Miller, 317 U.S. 369, 373-375, 63 S.Ct. 276, 87 L.Ed. 336 (1943); United States v. General Motors Corp., 323 U.S. 373, 377-380, 65 S.Ct. 357, 89 L.Ed. 311 (1945). The options held by the government did represent a property interest, and the question remaining is whether there is sufficient evidence indicating that the defendants have suffered some damage, so as to warrant a remand to the district court for the purpose of proper valuation. We hold that a remand is appropriate on the record before us.
 
 
 24
 While defendants did not suffer any actual loss of rental income the uncertainty created by the options, before their exercise, seems to have resulted in other losses to the defendants. There was testimony indicating that Benjamin Kaufman, who became the owner of the Borgfeldt Building in 1961 as the result of a sale and lease-back transaction with defendants Freidus and Aaron, was hampered in his attempts to refinance a mortgage on the building by the uncertainty surrounding the government's future possible occupancy. Transcript 98-102. The danger that the government would not exercise its option, thereby leaving the building with no capacity to produce income until a new tenant could be found, apparently reduced the building's attractiveness to potential mortgagees. The prospect of difficulties of this nature may have had the result that the defendants obtained less favorable terms under the sale and lease-back transaction than they would have received had the government's options not been in existence. See Transcript 43-44. If the defendants could show that the government's options resulted in less favorable sale and lease-back terms, then this would be one element of loss which should be taken into account in a condemnation award.
 
 
 25
 We do not believe that the evidence introduced by defendants established such an element of loss, but we remand in the belief that they are entitled to another opportunity to do so. The record indicates a high likelihood that the option aspect of the government's two takings damaged defendants to such a degree that the fair annual rental value set by the district court does not achieve just compensation for the takings. We hold that the district court should adjust this figure upwards if the defendants upon remand are able to demonstrate that they sustained economic loss because of the options, whether the loss be in respect to the terms of their transaction with Kaufman or in some other direct manner.
 
 
 26
 The district court, after hearing such further relevant evidence as all parties are able to present, should be able to assess the quantum of defendants' economic loss directly attributable to the options. But even with such evidence we acknowledge that the district court's valuation may lack precision, because of the unusual nature of the government's takings and the resulting absence of ready standards of comparison with similar transactions in the private real estate market. Where precision cannot be achieved, but it is clear that some economic loss has been sustained, the courts must look to all the surrounding circumstances in order to arrive at a valuation which, although perhaps not exact, represents a fair adjustment of the controversy. See Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950).
 
 
 27
 In the normal case the condemnees, having failed once to introduce evidence sufficient to justify an award above a certain amount in their favor, would not be entitled to a second chance upon remand. This is a case, however, where the condemnees should be afforded another opportunity to try their claim, for the manner in which the government chose to exercise its condemnation power was unusually burdensome, and rendered the defendants' task of establishing the value of their property interest taken unusually difficult. Cf. United States v. 70.39 Acres, 164 F.Supp. 451, 464-465 (S.D.Calif.1958). In such circumstances the courts must be alert to apply the generalizations prevalent in the field of eminent domain in a manner which achieves substantial justice in the particular case. See, e.g., United States v. General Motors Corp., 323 U.S. 373, 381-382, 65 S.Ct. 357, 89 L.Ed. 311 (1945); Kimball Laundry Co. v. United States, 338 U.S. 1, 14-15, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).
 
 
 28
 One of the burdens imposed upon defendants by the form of the government's takings has been the necessity of litigating the proper condemnation award for each year where the parties have been unable to stipulate the fair value of the interest taken. We do not think the costs of these repeated litigations can be included in the condemnation award, for they are an indirect, consequential result of the takings, rather than an element of loss inhering in the property interest of the defendants. United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945). But we do think that these burdens of relitigation make appropriate an award to defendants of their costs on this appeal, and we so order.
 
 
 29
 The case is remanded to the district court for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Sitting by designation