**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**IMPROVED PREMISES LOCATED AT the NORTHWEST CORNER OF IRVING PLACE AND SIXTEENTH STREET, known as 111 East Sixteenth Street, BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK, et al., Defendants.**

**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**CERTAIN LAND, together with the improvements thereon, LOCATED AT the NORTHWEST CORNER OF IRVING PLACE AND SIXTEENTH STREET, BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK, and Benjamin Kaufman, et al., Defendants.**

**Nos. Civ. 131–97, 62 Civ. 2272.**

United States District Court, S. D. New York.

April 10, 1973.

---

Peter H. Ruvolo, Trial Attorney, Dept. of Justice, Land and Natural Resources Division, Brooklyn, N. Y., for petitioner-plaintiff.

Friedman & Perlin, by Marshall, Perlin, New York City, for defendant Estate of Samuel E. Aaron.

Raphael, Searles, Vischi, Scher, Glover & D'Elia, New York City, for defendant Freidus; Sidney Z. Searles, Julius L. Sackman, New York City, of counsel.

## OPINION

BONSAL, District Judge.

These are proceedings to determine the fair compensation to the defendants arising out of the Government's use and occupancy of the Borgfeldt Building at 111 East 16th Street, Borough of Manhattan, New York City.

The Borgfeldt Building has been in continual litigation since its occupancy by the Government. United States v. 396 Corp., 264 F.2d 704 (2d Cir.), cert. denied, 361 U.S. 817, 80 S.Ct. 60, 4 L. Ed.2d 64 (1959); United States v. Improved Premises, 355 F.2d 316 (2d Cir 1966); United States v. Certain Land, Civ. Nos. 62–2272, 131–97 (S.D.N.Y. July 6, 1964), rev'd, 415 F.2d 265 (2d Cir.), modified, 420 F.2d 370 (2d Cir. 1969). See also United States v. Improved Premises, Civ. No. 131–97 (S.D. N.Y. Feb. 23, 1960).

The present proceeding is to determine the reasonable annual rental for the three years from July 1, 1964 to June 30, 1967 and to determine the direct economic loss, if any, sustained by the defendants by reason of the Government's annual options to renew on 30 days' notice for the seven years from July 1, 1960 to June 30, 1967.

The Borgfeldt Building is situated at the northwest corner of 16th Street and

Irving Place. It was built in 1909 for occupancy by the George Borgfeldt Company, an importer of German toys and merchandise, which company went out of business sometime after the United States entered the First World War in 1917. Its history from then to the middle 1930s is not clear, except that it was unoccupied for a period of five or six years following the onset of the 1929 Depression. The Metropolitan Life Insurance Company acquired title to the property through foreclosure sometime in the middle 1930s, and in 1937 leased the building to Consolidated Edison Company, which made improvements to render the building more suitable for office use. On June 1, 1945, the Government subleased the building from Consolidated Edison, and in September of 1947 commenced the first of a series of condemnations which kept it in occupancy through June 30, 1967, the end of the period here involved. During its occupancy, the Government made significant expenditures to fit the building for its office use, which improvements were not to become the property of the condemnees, the Government retaining the right to remove them within six months after it vacated the premises. Under the terms of the takings, the condemnees were responsible for exterior repairs, insurance and taxes, the Government being responsible for all other expenses.

In 1945, 396 Corporation ("396 Corp.") purchased the building from the Metropolitan Life Insurance Company for the sum of $1,000,000, paying $200,000 in cash and giving a 15-year purchase money mortgage (4%) in the amount of $800,000. The stockholders of 396 Corp. were Samuel E. Aaron and Jacob Freidus. In September, 1960, a sale and leaseback transaction was entered into between 396 Corp. as seller, and Benjamin Kaufman and Nathan P. Jacobs as purchasers. 396 Corp. sold the property to Kaufman and Jacobs for $2,136,000, who leased it back to 396 Corp. for a term of 21 years with an option to renew for six additional 21-year terms. On the sale, 396 Corp. received $1,000,000 in cash from the purchasers together with a $500,000 purchase money mortgage. The purchasers took the property, subject to the existing mortgage which had been reduced to $636,000. 396 Corp. assigned its purchase money mortgage to Kaufman and Jacobs to secure its obligations under the lease.

Under the terms of the lease, 396 Corp. was required to pay an annual rental of $120,000 (which is equal to 12% interest on the $1,000,000 which it received). In addition, 396 Corp. was required to pay real estate taxes and other expenses arising out of the possession and operation of the building not paid for by the Government, including mortgage payments on the existing first mortgage which were added to the basic rent of $120,000. (51–54).*

In September, 1961, 396 Corp. was dissolved and its assets were liquidated to its two stockholders, Aaron and Freidus. On the liquidation, Aaron and Freidus reported a "gain on dissolution" of $659,775.15. Aaron subsequently died, and his estate was substituted as a defendant in these proceedings.

In April, 1962, Kaufman and Jacobs initiated summary proceedings against Aaron and Freidus for non-payment of rent, which proceeding was settled by stipulation which provided, in part, that Kaufman would operate the building, collect all payments from the Government and remit any excess to Aaron and Freidus. (99).

In the late spring of 1967, Kaufman and Jacobs contracted to sell the building to Peter Feinberg conditioned on the termination of the leasehold. Title closed on February 1, 1968, to be effective January 1, 1968.[1] (56). Feinberg

* Page references refer to pages of the trial transcript.

1. The Government vacated the premises on June 3, 1968. Proceedings to determine the rental the Government should pay between July 1, 1967 and June 3, 1968 are said to be pending in the Court of Claims.

paid $400,000 cash, delivered a purchase money mortgage in the amount of $1,072,000, and assumed the existing first mortgage on which there was a balance of approximately $528,000. (57, 93). In connection with this sale, a second dispossession proceeding was institutes by Kaufman and Jacobs in June of 1967, and a final order of eviction and termination of the Aaron-Freidus leasehold was made on August 16, 1967. Kaufman agreed that he would await the outcome of these proceedings before he collected some $150,000 then due and owing to him by the lessees.

*Annual Rental for the Three Years July 1, 1964 to June 30, 1967*

The Government, based on the testimony of its expert, Morris, contends that the fair rental value for the property for the years in question is as follows:

| 1964 | $248,500 |
| 1965 | 255,000 |
| 1966 | 260,000 |

Defendants contend, on the basis of the testimony of their expert, O'Keefe, that the fair rental value for the property for the three years is $438,000 per annum or a total for the three years of $1,314,000. Both Morris and O'Keefe filed detailed appraisals.

In considering this issue, a review of the rentals on the property during the Government's occupancy, which were previously paid or fixed by the court in the condemnation proceedings, is enlightening:

*Rent*

PER ANNUM

| 1947–1953 | $145,335.82 | (Stipulated) |
| 1953–1956 | 215,000.00 | (Stipulated) |
| 1958–1960 | 225,000.00 | By the court. (Includes an award by reason of the Government's options, 264 F. 2d 704 (1959).) |
| 1958–1960 | 225,000.00 | By the court. (Plus reimbursement for any increase of real estate taxes.) |
| 1960–1964 | 230,000.00 | By the court. (Lumbard, J. at 415 F.2d 265, 268 stated: "The parties do not object to the basic fair rental value found by the district court for the years in question [1960–1964]. This value was set by the court at $230,000 per annum, after it declined to adopt the government expert's figure of $207,500, and the defendants' expert's figure of $385,000, the latter estimate taking into account the options.") |

---

In this proceeding, defendants seek an increase in the fair rental value for 1964–1967 to $438,000 per annum as against $230,000 for 1960–1964, while the Government contends that the fair rental value is:

| 1964 | $248,500 |
| 1965 | 255,000 |
| 1966 | 260,000 |

Defendant's expert, O'Keefe, found that the fair rental value was $2.25 per square foot, less 70¢ (for cost of operation by the Government), leaving $1.55 per square foot, which he multiplied by an estimated rental square footage of 283,000 to find a rental figure of $438,000 per annum. The Government appraiser, Morris, used a gross income approach and then deducted expenses.

He estimated the gross rentals for the property as follows:

1964  $1.80 x 292,000 sq. ft. = $525,000
1965  1.85 x 292,000 sq. ft. = $540,000
1966  1.90 x 292,000 sq. ft. = $555,000

Morris then deducted the estimated expenses of running the building to reach his net rental figures for the three years.[2]

In the proceeding to determine the fair rental value for 1960–1964, Judge Dimock used 215 Park Avenue South as a comparable building in fixing the rental at $230,000 per annum. In reaching this figure, Judge Dimock reduced his 215 figure by 20% because of improvements at 215 not present in the Borgfeldt Building. O'Keefe and Morris both used 215 Park Avenue South in their appraisals in this proceeding. O'Keefe found that the average net rental at 215 was $1.81 per square foot in 1964. Morris found that the average net rental for 1971—four years after the period here involved—was $2.40, and he would make a 10% deduction because of the difference in the appointments of the two buildings.

The evidence at the trial did not show how much fair rental value from 1964–1967 had increased as compared to 1960–1964. O'Keefe testified that during the entire period 1960–1967 there was a substantial demand for older buildings in the Union Square area by Federal, State and City governmental departments.

In considering the fair rental value, 1964–1967, O'Keefe states, " . . . it can be safely asserted that no two properties in the area are comparable (as modern office buildings are comparable)." Nevertheless, in estimating the rental value, "It is essential to refer to rentals paid in buildings in the area at the same time." Then, after reviewing four other buildings (401 Park Avenue South; 343 Park Avenue South; 260 Park Avenue South; and 215 Park Avenue South) and two individual floor leases made by the City of New York in 1966 and 1967 at 257 Park Avenue South and 315 Park Avenue South, O'Keefe expressed the opinion that the fair and reasonable rental value of the subject property from 1964 through 1967 was $2.25 per square foot, or $1.55 after deducting 70¢ for costs paid by the Government. O'Keefe's estimates appear to have been influenced by the fact that Kaufman sold the building to Feinberg in 1968, who completely rehabilitated the building and rented it to the City of New York for rentals substantially higher than those previously paid.

The Government's appraiser, Morris, using the income approach on a mul-

2. In his appraisal, O'Keefe used 283,000 square feet of usable space, which was based on the usable space available after the renovation of the building by Feinberg and its lease to the City of New York.

In the prior condemnation proceeding, Judge Dimock used a figure of 250,000 square feet. Morris used a gross figure of 292,500 square feet. O'Keefe's net figure is $1.55 per square foot ($2.25 gross, less 70¢ for cost of operation). Morris's gross figure for 1964 is $1.80 per square foot less 84¢ per square foot operating expenses, and less 10% deduction for his reserve, making a net figure of 78¢ per square foot, to which yearly taxes should be added. Morris's net income figure for the building for single tenant occupancy was $151,465 for 1964, to which he added the taxes for that year and other expenses to be paid by the condemnee. Morris's gross figure for 1965 is $1.85 per square foot less 87¢ per square foot for operating expenses, and less 10% deduction for his reserve, making a net figure of 79¢ per square foot, to which yearly taxes should be added. His net income figure for the building for single tenant occupancy was $155,005 for 1965, to which he added the taxes for that year and other expenses to be paid by the condemnee. His gross figure for 1966 is $1.90 per square foot less 90¢ per square foot for operating expenses, and less 10% deduction for his reserve, making a net figure of 81¢ per square foot, to which yearly taxes should be added. For 1966, his net income figure for the building for single tenant occupancy was $153,799, to which he added the taxes for that year and other expenses to be paid by the condemnee.

ti-tenant building (which this is not) estimated gross income as follows:

| | |
|---|---|
| 7/1/64 — 6/30/65 | $525,000 |
| 7/1/65 — 6/30/66 | 540,000 |
| 7/1/66 — 6/30/67 | 555,000 |

and after deducting a 10% reserve for vacancies and other contingencies and estimated operating expenses, and adding on the insurance and reserve for outside repairs and the cost of management, reached an estimated fair rental value as follows:

| | |
|---|---|
| 7/1/64 — 6/30/65 | $248,500 |
| 7/1/65 — 6/30/66 | 255,000 |
| 7/1/66 — 6/30/67 | 260,000 |

Since the entire building was rented to the Government during the three years (1964–1967), there is no apparent reason for Morris's deduction of 10% from the gross rentals for risk of vacancy and other contingencies.

While the assessed value of the property remained at $1,650,000 for 1964–1967, the real estate taxes increased as follows:

| | |
|---|---|
| 1963–64 (the year before the period here involved) | $65,700 |
| 1964–65 | 74,580 |
| 1965–66 | 76,395 |
| 1966–67 | 82,401 |

This would indicate that taxes increased by approximately 23.8% between 1963–1964 and 1966–1967.

Having been completely renovated, the present building can no longer serve as a basis for determining the fair rental value for the years 1964–1967.

Both O'Keefe and Morris testified as to other old buildings in the area. However, their testimony made it quite clear that, for one reason or another, these buildings were not comparable but were merely used in connection with their expert opinions. They are different in many respects and none of them were single occupancy buildings during the period involved.

The court cannot indulge in hindsight based on the subsequent history of the building when it was sold to Feinberg and leased to the City. There was not the slighest evidence that the defendants even envisaged, much less sought to take, the kind of action which Feinberg took after he purchased the building and the Government vacated it.

The court concludes that because of the nature of the building and the tenancy, its location, and its age, the Borgfeldt Building had no ascertainable market value during the period involved.

In considering the highest and best use to which the property could be put, Morris testified that " . . . considering that this was quite an old building, considering the cost of construction, that the highest and best use was the use to which the property was put," adding that " . . . no prudent real estate man would rehabilitate this property without having the actual tenant and without knowing exactly what the tenant wanted, and then obtaining a proper signature to back that up."

■■ The defendants were entitled to just compensation based on the highest and best use to which the property is adapted and can probably be put in the reasonably near future. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205 (1936); United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); United States v. Jones Beach State Parkway Authority, 255 F.2d 329 (2d Cir.), cert. denied, 358 U.S. 832, 79 S.Ct. 55, 3 L.Ed.2d 71 (1958); United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir.), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); United States v. 3.544 Acres of Land, More or Less, Situate in Philadelphia County, Pa., 147 F.2d 596 (3d Cir. 1945); United States v. 1.16 Acres, More or Less, in the City of Stamford, County of Fairfield, State of Connecticut, 300 F.Supp. 1021 (D.C.Conn.1969). However, the best use is considered at

the time of the taking and not on the basis of some subsequent development. Olson v. United States, *supra;* United States v. Meadow Brook Club, *supra;* United States v. 1.16 Acres, *supra.*

On the basis of the evidence, the court finds that the highest and best use of the property during the years 1964–1967 was the use to which it was put. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236 (1934).

For the foregoing reasons, in reaching a fair rental value for the years 1964–1967, the court has considered the historical rentals on the subject building since 1953 and has added an amount which it believes properly represents a fair increase because of rising business rentals and increases in taxes.

As previously indicated, the taxes on the property for the years 1964–1967 increased by approximately 23.8% over the taxes for the year 1963–1964, or an annual average increase of about 8%. O'Keefe and Morris agreed that it was the practice during this period to provide tax escalator clauses, which meant that the annual rental paid would be increased by the increase in real estate taxes.

O'Keefe testified that business rentals increased by 25% during the period 1960–1967, dependent on the type of building, which would indicate an annual average increase of 3½%. However, the data submitted by the Government after trial, pursuant to the court's request,[3] indicates that for two of the "comparative" buildings listed in Morris' appraisal report, the increases in net rentals were greater during the 1960–1964 period than during the 1964–1967 period. The Government's data showed that for 419 Park Avenue South, the average annual increases in net rentals for 1960–1964 were 1.7% and for 1964–1967 were 1.5%; that for 915 Broadway, the average annual increases in net rentals were 3% for 1960–64 and 1.9% for 1964–1967.[4] O'Keefe testified that construction costs increased by about 12% between 1960 to 1967, and by 7%

3. By letters to the attorneys for the parties dated Jan. 16, 1973, the court requested "schedules showing the net rentals on each of the 'comparative' buildings listed by Mr. O'Keefe and Mr. Morris in their respective appraisals, by year, 1960–1967." Pursuant to this request, the Government submitted a copy of a letter from Adams & Co. which gave the requested data for 159 Madison Avenue, 419 Park Avenue South, and 915 Broadway. The letter also indicated that for 257–65 and 215–19 Park Avenue South, the information set forth at p. 25 of Mr. Morris's Appraisal Report was the only information available due to changes in ownership and agents. Also pursuant to this request, Mr. Perlin, attorney for the defendant Estate of Aaron, on behalf of himself and Mr. Searles, attorney for defendant Freidus, submitted two letters dated Feb. 12, and Mar. 5, 1973, which letters were written to him from Mr. O'Keefe concerning this request. In the February 12 letter, Mr. O'Keefe states that "securing this information would be difficult and time consuming and that I had a further reservation of the ability to get adequate income and expense figures over the 7-year period which began thirteen years ago." and that his difficulties were due to rehabilitation, unavailability of records, and changes of ownership. In his March 5 letter, Mr. O'Keefe states that he is unable to obtain the requested data.

4. The yearly increases are as follows:

*419 Park Avenue South*

| | Year | Rental | % Increase |
|---|---|---|---|
| Feb. 1, | 1960 | $253,680 | — |
| " " | 1961 | 262,850 | 3.3% |
| " " | 1962 | 269,900 | 3.0 |
| " " | 1963 | 275,060 | 1.9 |
| " " | 1964 | 270,710 | —1.6 |
| " " | 1965 | 279,690 | 3.3 |
| " " | 1966 | 278,210 | — .5 |
| " " | 1967 | 282,930 | 1.7 |

*915 Broadway*

| | Year | Rental | % Increase |
|---|---|---|---|
| Feb. 1, | 1960 | $247,310 | — |
| " " | 1961 | 263,220 | 6.4 |
| " " | 1962 | 275,860 | 4.8 |
| " " | 1963 | 253,960 | —7.9 |
| " " | 1964 | 275,740 | 8.6 |
| " " | 1965 | 286,440 | 3.9 |
| " " | 1966 | 288,940 | .9 |
| " " | 1967 | 291,790 | 1.0 |

between 1960 to 1964, which would indicate an increase in construction costs during the period 1964–1967 of about 5% or an average annual increase of 1.-7%. Thus, the increases in net rentals for 419 Park Avenue South and 915 Broadway for the period 1964–1967 correspond approximately to what O'Keefe indicated were the increases in construction costs during the same period.

The court finds an increase in net rentals of 2% per year for the period 1964–1967 appropriate.

■ Therefore, considering the foregoing factors, the court finds that the fair rental value for the period 1964–1967 was:

| | |
|---|---|
| 1964–65 | $253,000 |
| 1965–66 | 278,300 |
| 1966–67 | 306,130 |

or a total of $837,430.

*Defendants' economic loss, if any, by reason of the Government's options for the period from July 1, 1960 to June 30, 1967*

On the basis of their expert, O'Keefe's testimony, defendants contend that they are entitled to an award in the amount of $1,750,000 to compensate them for their direct economic loss by reason of the Government's options for the period from July 1, 1960 to June 30, 1967. The Government, on the basis of its expert, Morris, contends that they are entitled to no award as they have shown no direct economic loss. United States v. Certain Land, 415 F.2d 265, 271 (2d Cir. 1969).

This issue has also been the subject of prior litigation. The problem arises from the manner of the Government's taking which was on a year-to-year basis. Each taking gave the Government an option to renew its taking for another year upon giving 30 days' notice prior to the expiration of the current year. In one of the earlier proceedings, Judge Knox, recognizing the unfairness of the 30-day option, required the Government to give at least six months' notice if it

wished to continue for another year. Judge Knox's determination was affirmed in the Court of Appeals. United States v. 396 Corp., 264 F.2d 704 (2d Cir. 1959).

The issue was presented to Judge Dimock with respect to the takings from 1960 to 1964. United States v. Certain Land, Civ. Nos. 62–2272, 131–97 (S.D. N.Y. July 6, 1964). Judge Dimock reasoned that the option clause created a risk of vacancy factor because of the uncertainty as to whether the Government would renew for the following year, and he valued this "risk of vacancy" factor at $555,833.33 plus interest for the period 1960–1964. The Court of Appeals reversed, United States v. Certain Land, 415 F.2d 265 (2d Cir. 1969), Judge Lumbard stating at 267: "We reverse, because we find that the risk of vacancy award of $555,833.33 far exceeds the actual economic loss suffered by defendants as a result of the options." The Court of Appeals pointed out that the Government exercised its options to vacate during the years under review, so that no vacancy occurred (this was also true of the years 1964–1967). The Court of Appeals held that any award, by reason of the options, must be based on the direct economic loss sustained by the defendants. In laying down the guidelines to be followed the Court, Judge Lumbard wrote, at 269 and 270:

"If, . . . defendants are able to submit additional evidence which establishes some element of direct economic loss to them as a result of the options, then we believe they are entitled to an award [for fair rental value] increased by this amount. Because of the repeated options taken by the government the defendants have been forced to bear the burdens of litigation for each yearly period for which the parties have been unable to agree on an appropriate rent. With this burden of repeated litigation should go the benefit of being permitted to introduce new evidence for the purpose of establishing defendants' right to a higher condemnation award.

* * * * * *

"It is quite conceivable that the defendants might suffer no provable damage by virtue of the options in one year, and yet sustain sizable loss in a future year when, for example, their active attempts to secure mortgage financing are defeated because of the option factor.

* * * * * *

"In this case a comparison with transactions in the free private market is not possible, for the evidence established that short-term options of the type taken by the government in this instance would never be given by an owner of a building like the Borgfeldt Building unless there were no rental market for the building. In light of this fact we must look to all the surrounding circumstances to determine the value of what the defendants actually lost by virtue of the short-term options held by the government during the four years in question."

██ No additional evidence was submitted by the defendants 396 Corp., Freidus, or the Estate of Aaron, to establish any direct economic loss to them by reason of the options, nor is there any evidence from which the court can conclude that the defendants made active attempts to secure mortgage financing which were defeated because of the option factor. The only testimony on the issue was given by Mr. Kaufman, who is not claiming an award in this proceeding.[5] Mr. Kaufman testified that the sale and leaseback in 1961 was an arm's length transaction. Therefore, his testimony that 396 Corp. made the sale and leaseback in 1961 because of its inability to finance due to the Government options is unpersuasive.

Judge Lumbard continued, at 270:

"It cannot be said that the defendants lost eighteen months rent, [as determined by Judge Dimock], or any lesser period of rental income, because of the options. It is true that the options created a risk of such a loss, but it was a risk of vacancy which did not materialize. In each of the four years the government in fact did exercise its option to renew, and thus the defendants received the full fair rental income from the building, as set by the district court, during this period."

The Government exercised its options for the years 1964–1967, so that no risk of vacancy materialized, and the full fair rental value for the period has been fixed herein.

Judge Lumbard continued, at 271:

"The options held by the government did represent a property interest, and the question remaining is whether there is sufficient evidence indicating that the defendants have suffered some damage, so as to warrant a remand to the district court for the purpose of proper valuation. We hold that a remand is appropriate on the record before us.

* * * * * *

"There was testimony indicating that Benjamin Kaufman, who became the owner of the Borgfeldt Building in 1961 . . . was hampered in his attempts to refinance a mortgage on the building by the uncertainty surrounding the government's future possible occupancy."

As previously stated, Kaufman is not claiming any direct loss in this proceeding, and no evidence was adduced that he attempted to refinance the existing mortgage on the building.

Judge Lumbard continued, at 271:

"If the defendants could show that the government's options resulted in less favorable sale and leaseback terms, then this would be one element of loss which should be taken into account in a condemnation award."

Defendants may "yet sustain sizable loss in a future year when, for example, their active attempts to secure mort-

---

5. He testified that he agreed to await the outcome of this proceeding before seeking to collect $150,000 which he said was owed to him by the defendants.

gage financing are defeated because of the option factor." (415 F.2d 269)

Kaufman testified that he was in touch with the Government and when they informed him in 1962 that they would remain in the building for another five years, he stopped looking for tenants; that in 1965 or 1966 the Government informed him that they had decided to vacate the building and move to the new Federal Building on Foley Square when it was completed. In the absence of any evidence to the contrary, it would seem that Freidus and Aaron could have obtained the same information from Kaufman or the Government.

There was no testimony on behalf of 396 Corp., Freidus, or the Aaron Estate that they obtained less favorable sale and leaseback terms because of the options. On the contrary, 396 Corp. received $1,000,000 in cash and, subsequently, on the liquidation of 396 Corp., Freidus and Aaron reported a gain of $659,775.15. Absent any testimony to the contrary, it would appear that at the time of the sale and leaseback, Freidus and Aaron were motivated by their desire to take cash out of the property rather than by any desire to develop or refinance it.

There was no evidence adduced at the trial to show that 396 Corp., Freidus, Aaron or his estate made active attempts to obtain mortgage financing, much less that these attempts were defeated by the Government's options.

In his testimony, O'Keefe, a recognized real estate expert, gave a glowing picture as to what he or a knowledgeable operator might have done with the property in the period 1960–1967 had it not been for the Government's options. However, the record does not show that the defendants made any efforts to refinance or to improve the property. On the contrary, the defendants appear to have been satisfied to have taken $1,000,000 out of the property in 1961 when they negotiated the sale and leaseback with Kaufman and Jacobs. Thereafter, they fell behind in their obligations, resulting in the eventual termination of their lease in 1967. By the time Kaufman sold the building to Feinberg, the defendants no longer had any interest in the property, so they obviously would not have been in a position to do what Feinberg did, which was to renovate the building and obtain an advantageous long-term lease from the City of New York. While Kaufman perhaps could make such a claim, he has made none in this proceeding. See United States v. Grand River Dam Authority, 363 U.S. 229, 236, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960); Omnia Commercial Co., Inc. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

While the court does not find that the defendants suffered any direct economic loss under the guidelines laid down by the Court of Appeals, it has considered the factors discussed by the experts on both sides during the trial, which were: (1) Marketability; (2) Inability to finance; (3) Inability to improve or plan for improvement; (4) Real Estate taxes; and (5) Sale of the property, as follows:

(1) *Marketability*

O'Keefe expressed the opinion that by reason of the options, the property was not marketable and that "The property was offered for sale but no buyers could be found." Except for the sale and leaseback in 1961 and the sale in 1968, there was no evidence that the property had been offered for sale. Morris disputes O'Keefe's opinion, pointing out that the property was sold in 1961 to Kaufman and Jacobs, and was sold again in 1968 to Feinberg. In his opinion, the prices paid on both occasions were fair and were not affected by the existence of the Government's options.

(2) *Inability to finance*

O'Keefe expressed the opinion that no one would consider making a mortgage loan on the property because of the Government's options, and pointed out that the holder of the underlying mortgage which matured in 1960 would not increase the mortgage but agreed only to

carry the unpaid balance at an increased interest rate. O'Keefe also pointed out that Feinberg, after the rehabilitation of the building, was able to secure a new mortgage. Morris disagreed, stating, "I don't know why in a period where if you had a mortgage, and the mortgage was still on the premises, that you necessarily go out and finance the property and pay higher rates when you don't have to. . . . and the tenant was paying sufficient to cover the charges."

As previously stated, there is no evidence that the defendants at any time sought to refinance the building, and they therefore did not suffer any direct economic loss for this reason.

### (3) *Inability to improve or plan for improvement*

O'Keefe. was of the opinion that the uncertainty created by the options precluded the defendants from planning improvements of the property so as to obtain higher rentals. Morris testified that there was no need for making any plans for improvement since the building was suitable for the tenant's (Government's) use. Morris was of the opinion that no plans for rehabilitation would be made unless desired by the tenant or unless another tenant was obtained who desired the building adapted to his particular needs.

There was no evidence that defendants at any time planned to rehabilitate the building or that they sought other tenants. Kaufman testified that he looked for tenants until he ascertained in 1962 that the Government would probably remain another five or six years, when he stopped looking for tenants.

### (4) *Real Estate taxes*

O'Keefe points out that the defendants were required to pay real estate taxes and that the taxes for the year 1966–1967 were 56% above the 1960–1961 level, and that the Government refused a tax escalation clause which was standard practice in similar buildings. This, according to O'Keefe, resulted in a steady diminution of net return.

Morris testified that he took the increase into consideration in arriving at the fair rental value for the period, on the basis of the defendants' paying taxes.

The answer to defendants' contention is that Judge Dimock considered the increase of taxes in determining the fair rental from 1960 to 1964, and that this court has also considered the increased taxes in determining the fair rental value from 1964 to 1967. It therefore is not a factor to establish any direct economic loss by reason of the Government options.

### (5) *Sale of the property*

O'Keefe was of the opinion that the 1960 sale was unfavorable to the defendants by reason of the Government options. There is no evidence to support this contention. Morris thought the 1960 sale leaseback was fair and reasonable, and there is no evidence that the defendants sought other buyers or that they sought any better terms than they obtained from Kaufman and Jacobs.

In his testimony, O'Keefe was of the opinion that the defendants would be entitled to only a single award in the amount of $1,750,000 by reason of the Government's options, even if the award were made in 1960. Had they been awarded this amount, this would be all they would have been entitled to, regardless of any subsequent uncertainties caused by the options. This view runs counter to the guidelines laid down by the Court of Appeals, which held that any award must be based on direct economic loss to the defendants. Another indication that O'Keefe was not thinking of direct economic loss to the defendants is his statement that in reaching the $1,750,000 figure he was treating the condemnee to be "a knowledgeable owning corporation; a knowledgeable lessee; and impersonal."

The peculiar manner of the Government's taking, including its annual options, was unusual and arbitrary and, in another context, might well have resulted in substantial direct economic loss to

the condemnee. However, on the record, no such direct economic loss has been shown by the defendants. No award will be made to the defendants by reason of alleged "economic loss."

It is true that the form of the Government's taking has placed a substantial burden upon the defendants because of the necessity of litigating the property condemnation award for each year where the parties were unable to stipulate the fair value of the interest taken. However, the Court of Appeals held, in the prior proceeding: (415 F.2d at 272)

"We do not think the costs of these repeated litigations can be included in the condemnation award, for they are an indirect, consequential result of the takings, rather than an element of loss inhering in the property interest of the defendants. United States v. General Motors Corp., 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945)."

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

Settle judgment on notice.